SOUTHERN PAC. CO. v. BOARD OF RAILROAD COM'RS OF CALIFORNIA et al. (UNITED STATES, Intervener).

(Circuit Court, N. D. California. November 30, 1896.)

No. 12,127.

1. CALIFORNIA RAILROAD COMMISSION—CONSTITUTIONAL LAW—UNLAWFUL DETERMINATIONS—POWER OF COURTS—INJUNCTIONS.

The constitution of California provides (article 12, § 22): "The state shall be divided into three districts, * * * in each of which one railroad commissioner shall be elected. * * * Said commissioners shall have power, and it shall be their duty, to establish rates of charge for the transportation of passengers and freight, by railroad and other transportation companies, * * * to hear and determine complaints against railroad and other transportation companies, * * * and enforce their decisions and correct abuses through the medium of the courts. * * * Any railroad corporation or transportation company which shall fail or refuse to conform to such rates as shall be established by such commissioners, or shall charge rates in excess thereof, * * * shall be fined not exceeding $20,000 for each offense, and every officer, agent or employee, of any such corporation or company, who shall demand or receive rates in excess thereof, or who shall in any manner violate the provisions of this section, shall be fined not exceeding $5,000, or be imprisoned in the county jail one year. In all controversies, civil or criminal, the rates of fares and freights established by said commission shall be deemed conclusively just and reasonable. * * *" The act of the legislature (April 15, 1880) passed to carry this provision into effect provides for serving upon a railroad affected a schedule of rates, adopted by the commission, which becomes effective in 20 days after service. Held that, under these provisions, the board of railroad commissioners is invested with administrative, as well as judicial and legislative, powers; and its duties are not so far discharged by the adoption and service of a schedule of rates as to leave nothing further to be done, and to put it beyond the jurisdiction of a court, in proceedings to restrain the enforcement of an unlawful determination.

2. SAME—SCHEDULES OF RATES.

Held, further, that a resolution of such board as to the propriety and necessity of a certain reduction of rates, which has not, however, been embodied in a schedule, and is not intended to be acted upon, without further investigation (as to which the solemn declaration of the commissioners must be taken as true by the courts), does not afford a basis for the action of a court to restrain the enforcement of such resolution, on the ground that the proposed rates are unreasonable.

3. SAME—UNREASONABLE SCHEDULE—INJUNCTION.

Held, further, that the functions of such commission are not so purely legislative that it is not amenable to the control of the courts, when it attempts to enforce a tariff of rates which is unjust and unreasonable.

**4. SAME.**

*Held,* further, that a suit to restrain the enforcement, by such commission, of an unreasonable schedule of rates, is not a suit to restrain criminal prosecutions.

**5. SAME—LEASED LINES—ESTOPPEL—ILLEGAL CONTRACTS.**

*Held,* further, that, where such commission has dealt with a corporation, operating lines of railroad under leases from other corporations, as an existing transportation company, by serving upon it a schedule of rates, and requiring it to conform thereto, it cannot afterwards, as an answer to a suit by such corporation to restrain the enforcement of the rates, object or inquire into the validity of the leases, under which the corporation operates its lines, or the power of the lessor companies to make them; nor have the principles applicable to suits between parties to illegal contracts, in pari delicto, any application to such a case.

**6. SAME—ESTOPPEL—ILLEGAL COMBINATION.**

*Held,* further, that such commission, having dealt with such an existing transportation company, is also estopped to object, in a suit by it, that it is an illegal combination.

**7. SAME—CONSTITUTIONAL LAW—FOREIGN CORPORATIONS.**

*Held,* further, that the above-stated provisions of the California constitution were not intended as conditions upon the exercise of their powers, within the state, by foreign corporations, nor as amendments of the charters of domestic corporations.

**8. SAME—AMENDMENT OF CORPORATE CHARTERS—PROPERTY RIGHTS—FEDERAL GUARANTIES.**

*Held,* further, that the power to amend the charters of corporations, which may be reserved, is not a power to withdraw from them the guaranties of the federal constitution, nor to affect any rights not given them solely by their charters. It does not extend to affecting the property acquired in the exercise of their functions.

**9. SAME—POWER OF STATE TO FIX RAILROAD RATES.**

*Held,* further, that, while a state has power to regulate railroad rates, such power, as well as the right of a railroad company to control its business, stops at injustice, the state having no right to fix a rate unreasonably low, though it may prevent a railroad from fixing one unreasonably high.

**10. SAME—UNREASONABLE RATES—UNCONSTITUTIONAL PROVISIONS.**

*Held,* further, that the provision of the constitution making the rates fixed by the commission conclusively just and reasonable is in conflict with the fourteenth amendment to the constitution of the United States, and void, but is so clearly separable from the rest of the provisions relating to the commission that it does not render them invalid.

**11. SAME—NOTICE OF FIXING OF RATES.**

It seems, further, that the provisions of the constitution, if correctly interpreted, as not requiring notice to the railroads of a proposed fixing of rates, are not, for that reason, invalid.

**12. SAME—UNLAWFUL DISCRIMINATION.**

*Held,* further, that, under the interpretation of the above-recited constitutional provision by the supreme court of California, which is binding on this court, and which holds the words "transportation companies" to include individuals, such provisions are not void, as discriminating between corporations and individuals.

**13. SAME—CONCLUSIVENESS OF RATES.**

*Held,* further, that the constitutional provision making rates conclusive is not equivalent to directing them to be made unreasonable.

**14. SAME—DECISIONS OF COMMISSION—INTEREST OF MEMBER.**

*Held,* further, that the interest, as a shipper, in the rates fixed, of one of the commissioners who takes part in fixing them, but whose vote is not necessary to the decision, does not render such decision invalid.

**15. SAME—PRIOR PLEDGE BY MEMBER OF COMMISSION.**

*Held,* further, that the fact that a member of the commission had pledged himself, before his election, to make certain changes in rates, which are embodied in schedules by the commission, does not necessarily affect the validity of such schedule, since the real question is as to the reasonableness of the rates fixed.

**16. SAME—WHAT ARE REASONABLE RATES.**

*Held,* further, that rates for railroad transportation are not alone unreasonable when they amount to practical confiscation, nor necessarily reasonable when they allow any dividend, however small; but a railroad company is entitled to be reimbursed its charges and expenses, and to receive, besides, an adequate return upon investment.

**17. SAME—OPERATING EXPENSES.**

*Held,* further, that in ascertaining the cost of operating a railroad, with reference to determining the reasonableness of rates, the expenses of operation are not to be strictly limited to the cost of running trains, excluding all betterments, but the cost of reasonable renewals and improvements of roadbed, track, and equipment should be included in the operating expenses.

**18. SAME—REASONABLENESS OF RATES—SOUTHERN PACIFIC RAILROADS.**

*Held,* further, in view of the facts appearing in this case, as to the receipts and expenditures of the Southern Pacific Company, taking into consideration the proper division of charges between it and its lessor companies, under its various leases, that no reduction should be made in its rates, and that the enforcement of a reduction, determined upon by the board of railroad commissioners, should be restrained.

The Southern Pacific Company is a corporation organized under a special act of the legislature of Kentucky, and operating, under leases, a number of railroads, in California and other states and territories, constituting its Pacific System.

On September 12 and 13, 1895, the board of railroad commissioners of California, acting under the powers conferred on it by section 22, art. 12, of the constitution of California, and by the act of the legislature of April 15, 1880, passed two resolutions, the first of which, adopted unanimously, and known as the "Grain Resolution," was as follows:

"Resolved, that the rates at present existing for the transportation of grain in California by the Southern Pacific Company, and its leased lines, as established by grain tariff No. 2 and all subsequent amendments thereto, be, and the same are hereby, reduced 8 per cent.; and the secretary of this board is hereby directed forthwith to prepare for publication by this board a schedule of rates in accordance herewith; and, when so prepared, the same shall be published at once, and take effect as soon thereafter as allowed by law, and that on the adoption of the revised general freight tariff of said company, herein provided for, any further per cent. deduction due said grain tariff, as provided herein, shall be given."

The second, adopted by the votes of Commissioners La Rue and Stanton, against the vote of Commissioner Clark, and known as the "25 Per Cent. Resolution," was as follows:

"Resolved, that the present rates of charges for the transportation of freights in California by the Southern Pacific Company and its leased lines are unjust to the shippers of the state. Therefore be it resolved, that the present rate of charges for the transportation of freights in California by the Southern Pacific Company and its leased liens be subjected to such an average reduction as including all reductions made therein since December 1, 1894, shall equal an average reduction of 25 per cent. upon said rates, as in existence on said December 1, 1894. Resolved, that this board proceed at once to adopt a revised schedule of rates in accordance herewith, in order that the same may be in force on or before January 1, 1896. And be it further resolved, that, if the necessities of the case so require, this board will at once proceed to the ascertainment of the proportion of the reduction due any commodity which, by reason of its nature, requires to be moved between now and the time herein fixed of the taking effect of said general reduction."

On October 14, 1895, the Southern Pacific Company filed its bill against the board of railroad commissioners, seeking to enjoin the en-

forcement of these resolutions, and obtained a temporary restraining order, with an order to show cause why it should not be continued. The United States also intervened in support of the prayer for an injunction; and affidavits and other proofs were submitted by all parties, with full arguments upon the question of the continuance of the injunction.

W. F. Herrin (J. C. Martin, J. E. Foulds, E. S. Pillsbury, and John Garber, of counsel), for complainant.

W. F. Fitzgerald, Atty. Gen. of California (Robt. Y. Hayne and W. W. Foote, of counsel), for defendants.

H. S. Foote, U. S. Atty.

McKENNA, Circuit Judge. This suit is brought against the board of railroad commissioners, to enjoin them from enforcing a certain resolution reducing the rates on grain and other freight on the lines of railroad operated by complainant. The bill is too long to quote in full; hence I shall give only such summary of its important allegations as will assist the understanding of this opinion.

It alleges the jurisdictional facts and the official character of respondents, and that the complainant is a corporation, and was incorporated and organized by an act of the commonwealth of Kentucky, empowering it to operate the lines of railroads described, and operating them as one system, generally known as the "Pacific System," of complainant. That it has a paid-up capital stock of $120,934,170, distributed among 150 shareholders. The lines of railroads are given by name, with their respective mileage and termini. That certain of said roads have an outstanding indebtedness, incurred for their construction and equipment, represented by interest bearing bonds, and secured by mortgage. The amount of indebtedness and the annual interest are given. That, by the leases to it, complainant is required to operate and maintain said roads in good repair, pay taxes, and provide for the payment of the interest aforesaid, which amounts, in the aggregate, to $8,420,000 or thereabouts. That to some of said roads complainant is obliged to pay a certain rent, and to pay certain sums to the government of the United States. The amount of rent and such sums are given, and, as far as necessary, will be referred to hereafter. That none of the lessor companies, except the California Pacific Company and Northern Railway Company, have, for more than a year last past, received or been entitled to any profit or net income whatever, or been able to pay any dividend to stockholders. That the rent received by the California Pacific Company and Northern Railway Company, after deducting necessary payments of interest and expenses, amounts to less than $2\frac{1}{2}$ per cent. per annum upon their respective capital stock; and that this must be expended in betterments and additions which are necessary for the proper operation and equipment of the road. That the cost and value of the properties largely exceeds the bonded indebtedness respectively thereon. That complainant has invested $4,832,491.78 in the purchase of property necessarily used and necessary to be used for and in con-

nection with the operation of said roads as said Pacific System, and of said amount the sum of $4,000,000 is invested in California. That, in order to enable complainant to operate said road, it must receive income sufficient to pay expenses, interest, etc., and is entitled to some profit. That complainant is engaged in state and interstate traffic; and that the rates of the latter have been fixed in pursuance of the provisions of the act to regulate interstate commerce; and that the rates on state traffic have been fixed as to the roads in California and Oregon by the board of railroad commissioners of said states, and in Nevada and the territories, in accordance with the laws thereof, respectively. That the rates upon freight arising and transported entirely in California are now lower, both actually and relatively, than the rates on freight arising and transported entirely within either of the other states, and, when established, were no more than sufficient to operate said roads down to the commencement of the year 1894; and that in that year an unusual depression in business occurred, so reducing the business of the complainant as to render its income insufficient to pay expenses, as hereinbefore set forth. That said depression, it is alleged on information and belief, will not be relieved; and that the business will not be increased during the present or the next ensuing year. That from time to time reductions have been made in rates, and from January, 1889, to June, 1895, to the amount of more than 35 per cent. A table, showing the reduction by years, is given in the bill. That the total receipts and expenditures of the Pacific System, during the calendar year 1894, were as follows:

Receipts ............................................... $31,458,522 64
Expenditures ........................................... 31,734,785 34
                                                          ─────────────
Showing a deficiency of................................ $   276,262 70

—The items of receipts and expenditures are given. That the total receipts for the first six months of the current year (1895), from the 1st day of January to the 30th day of June, for the Pacific System, were as follows:

Receipts .............................................. $14,836,125 77
Expenditures ........................................... 16,312,302 16
                                                          ─────────────
Leaving a deficiency of................................ $ 1,476,176 39

—The items are given. That there has been, at all times, economy of operation; and that the operation of said road as a system is a convenience to the public. The number of officers employed is alleged to be 71, who received a daily compensation of $16.25; total yearly compensation, $361,079.04. All its other employés, numbering 15,064, received an average daily compensation of $2.54; total yearly compensation, $11,972,667.73. That these rates were not unreasonable. That the rates in force upon the several railroads operated by complainant have been fixed according to circumstances and conditions surrounding the traffic, and with a careful regard to those conditions which affect their relative adjustment and classification, and are fair to shippers, and, in many cases, are fixed at the actual cost of transportation by reason of water and railroad

competition. That, notwithstanding the premises, the board of railroad commissioners did, on the 12th and 13th days of September, 1895, pass and adopt the resolutions complained of. They are set out in the bill, and, as the 25 per cent. resolution is given hereafter, I omit that here. The grain resolution is as follows:

"Resolved, that the rates at present existing for the transportation of grain in California by the Southern Pacific Company, and its leased lines, as established by grain tariff No. 2, and all subsequent amendments thereto, be, and the same are hereby, reduced 8 per cent.: and the secretary of this board is hereby directed forthwith to prepare for publication by this board a schedule of rates in accordance herewith; and, when so prepared, the same shall be published at once, and take effect as soon thereafter as allowed by law; and that on the adoption of the revised general freight tariff of said company, herein provided for, any further per cent. reduction due said grain tariff, as provided herein, shall be given."

—That the portion of the resolution having reference to the grain rates was adopted by a unanimous vote, and the remainder thereof was adopted by the vote of Hugh M. La Rue and James I. Stanton; William R. Clark voting against same. That, pursuant to the resolution, a schedule of the grain rates was prepared, and served on complainant on the 26th day of September, 1895; and that the board is proceeding to prepare a schedule of other rates, and will, not later than January 1, 1896, enforce them, unless restrained.

Complainant avers: That there is no reason to believe that there can be and will be an increase of complainant's business, and that the rates and reductions were resolved on arbitrarily and without evidence, and will be unjust, unfair, and unreasonable, and confiscatory of the property rights of complainant and its lessors. That such rates will require complainant to carry many classes of freight at less than cost, and that such loss cannot be made good. That they cannot be adopted without irreparable injury, and will cause a diminution of revenues, as nearly as can be ascertained, of $1,600,-000 per annum, and will be insufficient to pay expenses, as aforesaid, so that traffic can be conducted with safety, and, on information and belief, avers that the deficiency of the next ensuing year will exceed the sum of $4,000,000. That the injurious effect will extend to the interstate business of complainant to the amount of upward of $250,000. The reasons and manner are stated.

The bill gives the names of the California roads, and their mileage, the bonded indebtedness, and the amount of annual interest, their total receipts and expenditures, by items for the year 1894, and the first half of the year 1895.

The receipts for 1894 were.....................................$20,993,488 39
Expenditures .................................................. 20,558,991 34

Leaving a surplus of.....................................$    434,497 05

The total receipts for 1895 (ending June 30th)....................$  9,932,611 82
Expenditures .................................................. 10,796,303 11

Leaving a deficiency of .................................$    863,691 29

And it is alleged: That, under the proposed rates, there would have been for 1894, instead of a surplus, a deficiency of $1,340,502.95; and the deficiency of 1895 would be increased to $1,681,914.57. That

78 F.—16

there is no reason to expect a compensating increase of business, and hence during the next ensuing year there will be a deficiency of $2,363,829.14 on the California roads. That the defendants threaten a reduction in the rates of passenger fares, which are already just and reasonable. That Mr. La Rue and Mr. Stanton took the following pledge before election, and were elected in consequence thereof:

"Resolved, that the charges for the transportation of freights in California by the Southern Pacific Company of Kentucky and its leased lines should be subjected to an average reduction of not less than 25 per cent.; and we pledge our nominees for railroad commissioners to make this reduction."

—That Mr. La Rue is a raiser of agricultural produce, and a shipper thereof, and hence interested against complainant. That complainant has not consented to their acting, but protested against it. That the provisions of the constitution of the state of California, and the act of the legislature in aid thereof, are in violation of section 1 of the fourteenth amendment of the constitution of the United States. The particulars will be indicated hereafter. That defendants will proceed to promulgate and enforce the rates of freight as aforesaid, and that complainant will be harassed by a multiplicity of suits to enforce the same or the penalties of the constitution of the state. That the suit is of a civil nature, and that the matter in dispute exceeds, exclusive of interest and costs, $5,000, and that it is a cause arising under the constitution and laws of the United States.

There is the usual prayer for injunction pendente lite and perpetual.

There were filed with the bill affidavits supporting its allegations, and a temporary restraining order was granted, and also an order to show cause why it should not remain pending the suit. Upon the hearing, refuting affidavits were filed by respondents, and against these, and in support of the bill, complainant also filed other affidavits. There were also presented voluminous extracts from the testimony taken by the Pacific Railway commission, to show a wasteful and extravagant construction of certain of the roads, and also a diversion of the revenue to dividends, instead of being employed in debt paying. There were also introduced the leases to the Southern Pacific Company, and its annual report to its stockholders, showing the operations of its proprietary lines and those operated under leases; a very full exposition of its expenses and receipts.

The case has been elaborately argued; how elaborately is indicated by the fact that, when put into printed form, the arguments of complainant's counsel occupy 1,147 pages, and those of respondents' 1,031 pages. It is needless to say that counsel were all able, and that they neither abused nor wasted the opportunity given to them, nor neglected a single topic which could illustrate or expound the intricate problems involved in the controversy. The United States attorney, Mr. Foote, also presented a full and strong argument on behalf of the government's intervention, and its right to an injunction against the commissioners. The evidence and the arguments had to be considered by me, and this accounts, in part, for the time

I have taken for decision. In part, it is accounted for by other and imperative demands on my attention. This opinion will be long, and, while there is justification for it, I have, nevertheless, leaned against too elaborate an exposition; but I hope, in avoiding prolixity, I have not slighted any essential proposition, or failed to make my meaning plain.

The many propositions urged upon my consideration may not, with clearness, be tabulated or presented in a determined order. Some, however, naturally assume a precedence, and of these the two following are earnestly and ably urged by the counsel for respondents, as settling the controversy: (1) That the action on the grain resolution is completed, and hence the board of railroad commissioners has no further office to perform; or, putting it another way, the schedule has become the law of the land, to be enforced by suit by the proper state officers, or by the shippers. (2) As to the other resolution, which may be called the "25 Per Cent. Resolution," action has not gone far enough. It is claimed to be but a resolution of inquiry, upon which action is not yet determined.

Section 22 of article 12 of the constitution of California is as follows:

"The state shall be divided into three districts, * * * in each of which one railroad commissioner shall be elected. * * * Said commissioners shall have the power, and it shall be their duty, to establish rates of charges for the transportation of passengers and freight, by railroad and other transportation companies, * * * and enforce their decisions and correct abuses through the medium of the courts. * * * Any railroad corporation or transportation company which shall fail or refuse to conform to such rates as shall be established by such commissioners, or shall charge rates in excess thereof, * * * shall be fined not exceeding $20,000 for each offense, and every officer, agent or employee, of any such corporation or company, who shall demand or receive rates in excess thereof, or who shall in any manner violate the provisions of this section, shall be fined not exceeding $5,000, or be imprisoned in the county jail one year. In all controversies, civil or criminal, the rates of fares and freights established by said commission shall be deemed conclusively just and reasonable, and in any action against such corporation or company for damages sustained by charging excessive rates, the plaintiff, in addition to the actual damages, may, in the discretion of the judge or jury, recover exemplary damages. Said commission shall report to the governor, annually, their proceedings, and such other facts as may be deemed important. Nothing in this section shall prevent individuals from maintaining actions against any of such companies. The legislature * * * may confer such further powers on the commissioners as shall be necessary to enable them to perform the duties enjoined on them in this and the foregoing section. * * *"

The legislature passed an act in aid of the constitution, which is entitled "An act to organize and define the power of the board of railroad commissioners," approved April 15, 1880.

Section 11: "Whenever said board, in the discharge of its duties, shall establish or adopt rates of charges, * * * pursuant to the provisions of the constitution, said board shall serve a printed schedule of such rates * * * upon the * * * corporation affected thereby, and upon such service it shall be the duty of such * * * corporation to immediately cause copies of the same to be posted in all its offices, stationhouses, warehouses, and landing-offices affected by such rates, * * * in such manner as to be accessible to public inspection during usual business hours. Said board shall also make such further publication thereof as they shall deem proper or necessary for the public good. * * * The rates of charges established or adopted by said board, pursuant to the constitution and this act, shall go into force and effect on the twentieth day after service of said schedule."

In this action we are concerned only with the acts of the board of railroad commissioners, performed, performing, or to be performed. With the rights shippers have, we are not concerned. The grain schedule was served, and the 20 days prescribed by statute, after which the rates should go into effect, had not expired when the bill was filed. Were there yet any acts or duties to be performed by the board? It is very clear that, if there was nothing left to be performed,—if the rates had become the law to be enforced by other officers than the commissioners,—there was nothing to be enjoined in a suit against the commissioners.

The constitution is certainly not clear, and interpretation must be exercised by a very careful consideration of its language. After providing for the election of railroad commissioners, it enumerates their duties as follows (which I shall number for the purpose of distinction and reference): Said commissioners shall have the power, and it shall be their duty: (1) To establish rates of charges for transportation of passengers and freight by railroad and other transportation companies, and publish the same from time to time, with such changes as they may make. (2) To examine the books, records, and papers of all railroad and other transportation companies, and for this purpose they shall have the power to issue subpœnas and all other necessary process. (3) To hear and determine complaints against railroad and other transportation companies, to send for persons and papers, to administer oaths, take testimony, and punish for contempt of their orders and processes, in the same manner and to the same extent as courts of record, and to enforce their decisions and correct abuses through the medium of the courts. (4) Said commissioners shall subscribe (? prescribe) a uniform system of accounts to be kept by all such corporations and companies. It is under the third of the said enumerated provisions of the board that there is an implicit direction to "enforce their decisions and correct abuses through the medium. of the courts." Let us repeat its language in connection with the direction and injunction to the board.

"Said commissioners shall have the power, and it shall be their duty, * * * to hear and determine complaints against railroad and other transportation companies, to send for persons and papers, to administer oaths, take testimony, and punish for contempt of their orders and processes, in the same manner, and to the same extent, as courts of record, and to enforce their decisions and correct abuses through the medium of the courts."

It appears, therefore, that the board may hear and determine complaints. What complaints? Surely these may be as broad as the board's powers are, and as various as the misconduct of transportation companies. Upon whose complaint? Must the board wait as a court does to be invoked? Is it not a different instrumentality from a court? An active, seeking, supervising one,—the eye and the activity of the state,—expected to see and do what private interests may overlook, or be deterred from doing? I think so. But grant I am wrong; the board has the further power to correct abuses. What abuses? Only those complained of, or those, besides, which it discovers? If only those complained of, the phrase "to correct abuses" is but a repetition of the phrase "to enforce

their decisions." Primarily, we may not assume that it is superfluous, and reflection on the purposes of the constitution convinces that it was not intended to be. It must be construed as an independent gift of power, giving the commissioners as ample administrative powers in proper places as judicial and legislative powers in proper places. That this construction will make the board more efficient there can be no doubt, and I am not disposed to interpret any ambiguity so as to take away a valuable power, and one so consistent with, and, maybe, necessary to, the purposes for which the commission was created. The first contention is, therefore, not good.

The second contention is that the 25 per cent. resolution is only one of inquiry, not one of definite action, or, necessarily, one even of intended action. The attorney general says: "It is a kind of declaration, not binding upon the railroad commissioners as a body, or upon anybody else." He also says: "It does not amount to anything. It is the schedule, after all, which is the law." But it would seem that this is but a part of the sweeping contention that the railroad commissioners are not amenable to restraint at all; not, it is claimed, before a schedule is prepared and served, because their functions are then legislative; not after a schedule is prepared and served, because their function is done, and their acts are law, the enforcement of which must be restrained, if at all, by suits against other officers than them,—in other words, that the function of the commissioners is that of the legislature of the state, and, like the legislature, not amenable to the control of the courts. If this is so, it would seem from many precedents of suits against commissioners that it results from provisions peculiar to the California commission, and not from anything inevitably incident to the function or the office.

In support of this contention, a great many cases have been cited and reviewed, which I need not comment upon. They, undoubtedly, decide that the purely legislative functions of any official body cannot be controlled by the courts, but, in the case of railroad commissions, the supreme court of the United States has distinguished executive from legislative functions, and has asserted the power to restrain the latter when their attempt is to enforce a tariff of rates which may be unjust and unreasonable. Railroad Commission Cases, 116 U. S. 307, 6 Sup. Ct. 334, 348, 349, 388, 391, 1191; Reagan v. Trust Co., 154 U. S. 362, 14 Sup. Ct. 1047. In the latter case the powers of the court were clearly defined, and I shall quote from it fully. The same broad contention was made in that case that is made in this, and to it the court replied, through Mr. Justice Brewer, as follows:

"It appears from the bill that, in pursuance of the powers given to it by this act, the state commission has made a body of rates for fares and freights. This body of rates, as a whole, is challenged by the plaintiff as unreasonable, unjust, and working a destruction of its rights of property. The defendant denies the power of the court to entertain an inquiry into that matter, insisting that the fixing of rates for carriage by a public carrier is a matter wholly within the power of the legislative department of the government, and beyond examination by the courts. * * *"

·'And,·after ·further comment: ·                               : ·':

· "The ·courts are not authorized to revise or change the body of rates imposed by a. legislature or a commission. They do not determine whether one rate is preferable to another, or what, under all circumstances, would be fair and reasonable as between carriers and shippers. They do not engage in any mere administrative work; but still there can be no doubt of their power and duty to inquire whether a body of rates prescribed by a legislature or a commission is unjust and unreasonable, and such as to work a practical destruction to rights of property, and, if found so to be, to restrain its operation."

After reviewing a number of cases, the learned justice continued as follows: ·

"These cases all support the proposition that, while it is not the province of the courts to enter upon the merely administrative duty of framing a tariff of rates for carriage, it is within the scope of judicial power, and a part of judicial duty, to restrain anything which, in the form of a regulation of rates, operates to deny the owners of property invested in the business of transportation that equal protection which is the constitutional right of all owners of other property. There is nothing new or strange in this. It has always been a part of the judicial function to determine whether the act of one party (whether that party be a single individual, an organized body, or the public as a whole) operates to divest the other party of any rights of person or property. In every constitution is the guaranty against the taking of private property for public purposes without just compensation. The equal protection of the laws which, by the fourteenth amendment, no state can deny to the individual, forbids legislation, in whatever form it may be enacted, by which the property of one individual is, without compensation, wrested from him for the benefit of another, or of the public. This, as has been often observed, is a government of law, and not a government of men; and it must never be forgotten that under such a government, with its constitutional limitations and guaranties, the forms of law and the machinery of government, with all their reach and power, must, in their actual workings, stop on the hither side of the unnecessary and uncompensated taking or destruction of any private property, legally acquired and legally held. It was therefore within the competency of the circuit court of the United States for the Western district of Texas, at the instance of the plaintiff, a citizen of another state, to enter upon an inquiry as to the reasonableness and justice of the rates prescribed by the railroad commission."

And, marking the limits of the powers of the court, he further said:

"As we have seen, it is not the function of the courts to establish a schedule of rates. It is not, therefore, within our power to prepare a new schedule, or rearrange this. Our inquiry is limited to the effect of the tariff as a whole, including therein the rates prescribed for all the several classes of goods, and the decree must either condemn or sustain this act of quasi legislation."

We are brought back to the inquiry concerning the duties which are devolved on the board of commissioners, and these, we have seen, are not only to enact provisions of regulation of rates, but to enforce them; and hence, certainly, when the former is done, and the latter is threatened, the courts have power to review the regulation, and, to use Justice Brewer's words, "condemn or sustain this act of quasi legislation."

The broad contention of respondents cannot therefore be sustained. May the special one (to quote the attorney general), that the 25 per cent. resolution is "a kind of declaration not binding upon the railroad commission as a body, or upon anybody else"? In an absolute sense, the resolution is not binding on the railroad commission or on any one else. It would not be even if a formal schedule

were prepared; not even if the schedule was served. Its obligation only attaches upon 30 days after service. It cannot be enforced until then. It need not be obeyed until them. But the object of the suit is to prevent that occurrence,—to arrest its obligation; not as an executed exercise of power, but as a threatened exercise of power. The question, then, is, is the resolution of this character, as tested by the Reagan Case? "It is not the function of the courts," says that case, "to establish a schedule of rates. * * * Our inquiry is limited to the effect of the tariff as a whole, including therein the rates prescribed for all the several classes of goods, and the decree must either condemn or sustain this act of quasi legislation." Does this mean that the power of the courts is confined to review only? What judgment is to be exercised is beyond their control. A regulation being determined by a board of railroad commissioners, then an inquiry as to its reasonableness will be entertained, and judicially sustained or condemned as it is that or not that. Is the 25 per cent. resolution such a determination? The resolution is as follows:

"Resolved, that the present rates of charges for the transportation of freights in California by the Southern Pacific Company and its leased lines are unjust to the shippers of the state. Therefore, be it resolved, that the present rate of charges for the transportation of freights in California by the Southern Pacific Company and its leased lines be subjected to such an average reduction as, including all reductions made therein since December 1, 1894, shall equal an average reduction of 25 per cent. upon said rates, as in existence on said December 1, 1894. Resolved, that this board proceed at once to adopt a revised schedule of rates in accordance herewith, in order that the same may be in force on or before January 1, 1896. And be it further resolved, that, if the necessities of the case so require, this board will at once proceed to the ascertainment of the proportion of the reduction due any commodity which, by reason of its nature, requires to be moved between now and the time herein fixed of the taking effect of said general reduction."

The language of the resolution is positive as to the necessity of the reduction, and as to the amount, and upon what consideration and evidence it was based Mr. La Rue recites in his affidavit as follows: That the reduction in grain rates established, and the further reduction upon all other classes of freights generally proposed, were not resolved arbitrarily, but after a complete individual and official investigation of the existing rates upon the various roads, and of the effect thereof upon the commerce of the state, upon the earnings and expenses, the revenues, the fixed charges, bonded indebtedness, and net income of said lines of railroad of said corporations; that a full and complete hearing, covering a number of days, was accorded complainant, who appeared by attorney, and that a large number of witnesses were examined; that the grain and other rates were fully investigated, and from such investigation affiant affirms his belief that the grain and other rates in existence on the 12th of September, 1895, on said railroads, "were and are excessive, exorbitant, and discriminative, and were and are a burden upon and unjust to the shippers of California"; that the grain reduction, and reduction in other rates, "as is indicated in said resolution, would be fair, just, and reasonable, both to the shippers of the state and to each and all of the alleged lessors of said

complainant owning lines of railroad within the state of California, and within the jurisdiction of said board and to said complainant." There are repetitions of these allegations in other paragraphs. Language can hardly be clearer or stronger. It opposes to the allegations of the bill by the utmost explicitness of statement (repeated in several ways), that the rates are unjust, discriminative, and burdensome. And this conviction is expressed upon an individual and collective investigation into all the elements of judgment regarding the interests of the roads and the interests of the state. I repeat, language can hardly be clearer or stronger. It is a confident declaration of knowledge, and seems to leave, as to the totality of the reduction, no fact to be inquired about,—none of its justice, none of the duty and purpose of the board. It would seem, therefore, to bear the test of the Reagan Case. But, in other affidavits, Mr. La Rue and Mr. Stanton aver that they did not intend the resolution as a final judgment of the board, but that the board intended a more definite and particular investigation into the conditions of the several railroads forming the Pacific System of complainant, and that regulation or nonregulation will depend upon that investigation; and more explicitly and emphatically have they stated this through their counsel. Mr. Hayne said:

"They say [the commission] that they do not consider it binding, and are not going to do anything without further consideration, which, of course, may lead to very different results. The service, if it is to be made, has to be made by their order, by their authority; and they have not yet even made up the schedule which is to be served. They come here, high officers of state, and swear they are not going to take the action without a further, full, free, and fair investigation."

I am disposed to accept this as true and sincere. Indeed, I do not know how not to do so, regarding them, as they must be regarded, as truthful; nor do I care to risk the slightest embarrassment to them as officers in any proper investigation of the complainant, or any of its constituent roads, the results of which cannot be put into force, even if it was desired to, except in a direct and open way, and the detriment of which, if any, can be arrested before it fall.

The respondents object to the remedy of the bill, and insist that no injunction can be granted, because the things to be restrained, it is claimed, are criminal prosecutions, and them a court of equity cannot enjoin. The answer to this contention is that this is not a suit to restrain a criminal prosecution. It is a suit restrain an asserted illegal action of the board of railroad commissioners, which will injuriously affect the interests and property rights of the complainant. Besides, the contention is fully answered by authority. Justice Miller, in his concurring opinion, in Chicago, M. & St. P. Ry. Co. v. Minnesota, 134 U. S. 459, 10 Sup. Ct. 703, laid down certain principles in the form of propositions which should govern the class of questions with which this case is concerned. After stating the power of the legislature, either directly or through the agency of a commission, to regulate rates, and the limitations of such power to be that the rates should not be so unreasonable as to practically destroy the value of the property, or so exorbitant as to be in utter disregard of the rights of the public, said:

"(4) In either of these classes of cases there is an ultimate remedy by the parties aggrieved, in the courts, for relief against such oppressive legislation, and especially in the courts of the United States, where the tariff of rates established either by the legislature or by the commission is such as to deprive a party of his property without due process of law.

"(5) But until the judiciary has been appealed to, to declare the regulations made, whether by the legislature or by the commission, voidable for the reasons mentioned, the tariff of rates so fixed is the law of the land, and must be submitted to, both by the carrier and the parties with whom he deals.

"(6) That the proper, if not the only, mode of judicial relief against the tariff of rates established by the legislature, or by its commission, is by a bill in chancery asserting its unreasonable character, and its conflict with the constitution of the United States, and asking a decree of court forbidding the corporation from exacting such fare as excessive, or establishing its right to collect the rates as being within the limits of a just compensation for the services rendered.

"(7) That, until this is done, it is not competent for each individual having dealings with the carrying corporation, or for the corporation, with regard to each individual who demands its services, to raise a contest in the courts over the questions which ought to be settled in this general and conclusive method."

The respect which Justice Miller's opinions on any proposition receive would justify me in resting my decision of this point on his views; but he is supported by Mr. Justice Brewer, in the Dey Case, 35 Fed. 866; also, by the Gill Case, 156 U. S. 659, 15 Sup. Ct. 488, where his words are quoted and approved, and by the implied authority of the Reagan Case and other cases.

There are two other propositions made by the respondents, which precede the consideration of the "merits," properly so called. They are as follows: (1) That the leases executed by the several lessor companies to the complainant, by the terms of which all of their franchises and property were transferred, are void, because executed without express congressional or legislative authority, and therefore ultra vires of the purposes for which those corporations were created, to wit, the six California corporations, namely, Central Pacific Railroad Company, the Southern Pacific Company of California, Southern Pacific Coast Railway Company, the Northern Railway Company, and the Northern California Railroad Company, without the authority of the California legislature, the Central Pacific Railroad Company, and the Southern Pacific Railroad Company, without express congressional authority. (2) That the so-called "Pacific System" is an unlawful combination, in violation of section 20 of article 12 of the constitution of the state.

These propositions are countered by the complainant by the objections that the board of commissioners cannot be heard to make either proposition,—not the first, because the leases are not open to collateral attack on the ground of ultra vires in this proceeding, and under the circumstances of this case; that the sovereign alone can object; and that they must be held valid until declared otherwise by a direct proceeding; not the second, because the board of railroad commissioners has dealt with, and its proceedings and orders are against, the Southern Pacific Company, and not the several or any of the lessor companies. These counterpropositions should be first considered, and, if well made, will save an inquiry of the strength of the others, and many independent ones which have been

argued at length and with ability by counsel. The consideration falls under two heads: (1) Abuse of powers,—acts in excess of its conditions and limitations. These, it is conceded, are not subject to collateral attack. (2) Total want of power without limitation or qualification. These, it is asserted, are open to collateral attack by anybody, and the ground of it is said to be an antagonism to public policy.

The cases cited by respondents' counsel undoubtedly establish that a railroad company has only the powers conferred by its charter, and that contracts in excess of these are void, and, if void as to one party, void as to all parties. For this doctrine, however, the decisions of the supreme court are sufficient. Mr. Justice Gray said, in Central Transp. Co. v. Pullman's Palace Car Co., 139 U. S. 40, 11 Sup. Ct. 481:

"Upon the authority and the duty of a corporation to exercise the powers granted to it by the legislature, and those only, and upon the invalidity of any contract, made beyond those powers, or providing for their disuse or alienation, there is no occasion to refer to decisions of other courts; because the judgments of this court, especially those delivered within the last twelve years by the late Mr. Justice Miller, afford satisfactory guides and ample illustrations."

The learned justice then reviews the cases, and sums up as follows:

"The clear result of these decisions may be summed up thus: The charter of a corporation, read in the light of any general laws, which are applicable, is the measure of its powers, and the enumeration of those powers implies the exclusion of all others not fairly incidental. All contracts made by a corporation beyond the scope of those powers are unlawful and void, and no action can be maintained upon them in the courts, and this upon three distinct grounds: The obligation of every one contracting with a corporation to take notice of the legal limits of its powers; the interest of the stockholders not to be subjected to risks which they have undertaken; and, above all, the interest of the public, that the corporation shall not transcend the powers conferred upon it by law. A corporation cannot, without the assent of the legislature, transfer its franchise to another corporation, and abnegate the performance of the duties to the public, imposed upon it by its charter as the consideration for the grant of its franchise. Neither the grant of a franchise to transport passengers, nor a general authority to sell and dispose of property, empowers the grantee, while it continues to exist as a corporation, to sell or to lease its entire property and franchise to another corporation. These principles apply equally to companies incorporated by special charter from the legislature, and to those formed by articles of association under general laws."

This must be accepted as law. But is it applicable to the case at bar? The instance upon which it was expressed arose out of a controversy between the parties to the act, which was held to contravene public policy, and of like kind were the cases cited and reviewed. The contract, being void as to one of the parties, was void as to all. But the case at bar is not between the contracting parties,—not between the Southern Pacific Company and its various lessor companies. It is concerned alone with the acts of the state, as affecting the property of one of its citizens or residents. There is no element of antagonism to public policy, as that is understood and involved in the cases cited. There are no contracting wrong-doers seeking to avoid or enforce an act of misfeasance. The case of Central Transp. Co. v. Pullman's Palace Car Co. hence lacks an

essential analogy to the case at bar. It, besides, seems inapplicable, not only from the essential nature of the board of railroad commissioners, but from the terms of the constitution of the state. The power and duty of the board is "to establish rates of charges for the transportation of passengers by freight and other transportation companies" (section 2, art. 12, Const.); and the act in aid of the constitution continues the idea, and provides as follows:

"Sec. 14. The term 'transportation companies' shall be deemed to mean and include: First. All companies owning and operating railroads (other than street railroads) within this state. * * * The word 'company,' as used in this act, shall be deemed to mean and include corporations, associations, partnerships, trustees, agents, assignees and individuals."

It was admitted in the argument that the board of commissioners dealt with transportation companies as they existed, as a fact, not with the validity of their existence. It is easily conceivable that, if the latter were necessary, confusion and weakness of administration would result. On the argument, the following colloquy occurred between counsel, Mr. Garber, one of the counsel for complainant, and Mr. Hayne, one of the counsel for respondents:

"Mr. Garber (among other things): Even if the state of California, in the exercise of its police power, and the power to regulate rates and charges of these companies, could itself have gone back of the concrete fact of operation and transportation and use by the companies, it has not conferred upon this commission any such power. Every feature, every line of this constitutional provision, and of the statute re-enforcing it, negative any such thought, in my judgment. Mr. Hayne: That is, that the commission should inquire into— Mr. Garber: Into the validity of this lease. I say they have no power to do it. Mr. Hayne: We do not say that the commission has that power, but we say that, when the complainant comes before the court, the court has it."

And it was further admitted that the questions of ultra vires and public policy and fraud, which had been discussed in court, the commission had not the power to entertain. But it was claimed that the validity of the leases, and their character, became a link in complainant's chain of title,—a condition of its right, if I understand the claim, of its appeal to a court of equity. But this is not so. The condition of its appeal to a court of equity is that it has assumed to be, and that the state has assumed it to be, a transportation company, and has dealt with it as such,—regulated properties in its possession as such. In question of its rights? Certainly not; but only in regulation of them. And how can a court judge of the regulation but as the commissioners did? And what rights or wrongs of the complainant can the court consider which the commissioners could not? If complainant could be regulated, it can complain of that regulation. It and the commission were not parties to an illegal contract, from which the law will give no relief; leaving them where they put themselves, as in the cases cited by counsel. The board of railroad commissioners is a governmental agent, performing a duty, executing a power. It acts (either administratively, judicially, or legislatively; it is not necessary now to consider which) for the state. Ought it to say—can it be heard to say—that any person can be an outlaw to its action? Would this not be an absolute perversion of its powers? Can the commission,

being bound by a fact, or having the right to assume a fact in its action, yet question the fact when its action is complained of? A negative is so self-evident that it seems to be weakened by an attempt to support it. Certainly analogies from cases of wrongdoers help us nothing. The law (which is the state), for wisest policy, will give no help to wrongdoers. They being in pari delictu, the law gives aid to neither. But would not it be anomalous, if nothing more, for the law itself to claim to be in pari delictu with anybody, and that, too, by proceedings in invitum, and then assert irresponsibility or immunity by it? As I have said, a negative seems self-evident, and the greatest difficulty I have found in the contention of respondents is in the ability and earnestness of the counsel who urge it, and I pass it now, with something of the feeling that I may not understand it, and, because not understanding it, do not appreciate its strength.

The commissioners dealt with the Southern Pacific Company. Their notices were served on it; their hearings were granted to it; and the grain schedule was served on it. The object of the other resolution is the regulation of it. It is only its officers, agents, or employés who can be fined or imprisoned for violation of such regulation, for it is only they who can demand or receive rates in excess of those prescribed. The strength of this reasoning was felt somewhat by counsel for the respondents, and it was sought to be answered by saying that the Southern Pacific Company was the agent of its lessor companies. If this, as an argument, be not felo de se, its inadequacy is apparent. If accepted fully,—and it must be, if at all,—the civil and criminal responsibilities would be staggering. I think, therefore, that, as the Southern Pacific Company was regulated, it may complain of that regulation; that, if its possession and management of the railroad properties could be assumed or accepted as valid by the board of commissioners for the purpose of regulation, they may be by the court in order to review the justness of that regulation. This is consistent and rational,—makes effective the constitution and the laws, and gives full and efficient exercise to and execution of the powers of the board. Further than this I do not now consider it necessary to go. Maybe further than this I cannot go, for beyond this there are serious questions.

A railroad commission is a state instrumentality, having the power, and obliged, as a duty, to regulate the rates on railroads of the state. It may do so on one and all, according to the conditions and circumstances of each. Surely so if the roads be under separate ownership and management, and may be so when united in ownership or management. It is seriously disputable if any road can remove itself from amenability to regulation, even if it have the power to lease. Under the power to lease, the operation of the road may be transferred, but transferred with all legal burdens on its head, with all the compulsory submissions to which it is subject. However, these questions may be passed now to puzzle a future consideration, as well as that other and even more serious one, of what makes the value of a railroad. The question came up in the Ames Case, 64 Fed. 165, but only came up,—but not answered. Is it what

it cost, or what it could be built for, or what it can charge, if not regulated?

This view makes it unnecessary to consider whether the act of the state of California passed in 1861, and amended in 1863 (St. 1863, p. 613), which reads as follows: "Any railroad corporation organized under the act to which this is amendatory, shall have the right to lease the whole or any portion of their road to any other corporation organized under this act, or to grant to any such corporation the right to use in common any portion of their road,"—or the act of April 3, 1880 (St. 1880, p. 21), entitled "An act permitting and authorizing railway and other corporations organized under the laws of this state, or of any state or territory, or any act of congress of the United States of America, to do business on equal terms,"—confers on railroads the power of leasing, or that the latter act is unconstitutional, because its object is not expressed in its title, or to determine the other controversy raised on the statutes of the state of Kentucky incorporating the Southern Pacific Company.

It is also contended that the constitution applies to all corporations, foreign and domestic, and that its provisions are binding upon both, without, as I understand counsel, the right of objection on the part of either to their invalidity, for the following reasons: (1) On foreign corporations, even though void as to domestic ones, because it is a condition of their doing business within the state; (2) on domestic corporations, because it is an amendment to their charters, and hence an exercise of the reserve power of the state to alter and amend them. If the contention is true, what limitation is there to the power of the legislature? All constitutional restraints seem to be abolished by it, and corporations, foreign and domestic, are subject to the will of the legislature. As to foreign corporations, counsel for respondents declare this: "It is not a question of power," says one of the counsel; "it is a question of will." If it is a question of will as to foreign, it is also a question of will as to domestic, corporations; and the only admitted exception to its exercise is the physical taking of the property of the corporation,—of a railroad corporation (to make the application to the kind we are considering), of its rails and cars. It may put such conditions on their use as it pleases, and these, though they would be invalid as unconstitutional exercise of power against a natural person or a co-partnership of natural persons owning or using the same kind of property. This is a serious discrimination, and even if the power to make it be granted, when we should come to interpret the legislative will, we well might object to imply it from anything but the clearest language definitely used. That the California constitution had such intention can hardly be contended. That it contemplated or implied conditions upon foreign corporations or domestic ones cannot be contended. It was a regulation, not of corporations, but of railroads, no matter by whom owned or managed. This disposes of the contention, certainly, as to foreign corporations. I cannot take the power to do a thing for the exercise of it, and put conditions and discriminations in the con-

stitution which are neither expressed in it, nor contemplated by it. As to domestic corporations, if anything further be necessary (and the reasoning is applicable to foreign corporations), it is found in the Railroad Tax Cases, 13 Fed. 722–789. It is there said that the power of amendment of the charter of corporations, or of the law under which they are formed, is not a power to withdraw from them the guaranties of the federal constitution.

"Whatever the state may do," Mr. Justice Field, sitting as circuit justice, said, "even with the creations of its own will, it must do in subordination to the inhibitions of the federal constitution. It may confer, by its general laws, upon corporations, certain capacities of doing business, and of having perpetual succession in their members. It may make its grant in these respects revocable at pleasure. It may make the grant subject to modifications, and impose conditions upon its use, and reserve the right to change these at will. But, whatever property the corporations acquire in the exercise of the capacities conferred, they hold under the same guaranties which protect the property of individuals from spoliation. It cannot be taken for public use without compensation. It cannot be taken without due process of law, nor can it be subjected to burdens different from those laid upon the property of individuals under like circumstances. The state grants to railroad corporations formed under its laws a franchise, and over it retains control, and may withdraw or modify it. By the reservation clause, it retains power only over that which it grants. * * * The reservation relates only to the contract of incorporation, which, without such reservation, would be irrepealable. It removes the impediment to legislation touching the contract. It places the corporation in the same position it would have occupied had the supreme court held that charters are not contracts, and that laws repealing or altering them did not impair the obligation of contracts. The property of a corporation acquired in the exercise of its faculties is held independently of such reserved power, and the state can only exercise over it the control which it exercises over the property of individuals engaged in similar business."

And Judge Sawyer said, on page 777:

"The legislature, under the various guaranties of the constitution, state and national, can only take away, limit, enlarge, or modify that which it gave. And what is given in the creative act is, simply, its capacities; its legal faculties, including all such as are essential to its corporate existence; all those powers which are strictly corporate, being those powers which can only be given by legislative act; powers not possessed by natural persons or partnerships, acting in their natural, individual, or associate characters, independent of legislation. These strict corporate powers I attempted to define in Orton's Case, 6 Sawy. 187, 32 Fed. 457."

The cases cited by respondents' counsel to sustain their contention are distinctly different from the case at bar. In all of them, except those especially noticed hereafter, the power exercised was the ordinary governmental and sovereign one of taxation (Tomlinson v. Jessup, 15 Wall. 456; Hamilton Gas, Light & Coke Co. v. Hamilton City, 146 U. S. 258, 13 Sup. Ct. 90; People v. Cook, 148 U. S. 397, 13 Sup. Ct. 645; Mayor, etc., of New York v. Twenty-Third St. Ry. Co., 113 N. Y. 311, 21 N. E. 60; Railway Co. v. Maine, 96 U. S. 499), or an administrative regulation of the affairs of the corporation to secure creditors and stockholders (Sinking Fund Cases, 99 U. S. 700), or an exercise of a right under the laws of Massachusetts to regulate the right of fishery (Holyoke Co. v. Lyman, 15 Wall. 500). In all of these cases the impediment to the exercise of the power was the charters of the respective corporations, and their sanctity as contracts. It was held that there was not impairment of their

obligations as contracts, because the right of amendment formed part of the contract, and was of the same obligatory character.

In Greenwood v. Freight Co., 105 U. S. 13, the instance of the exercise of this right was the repeal of the act of incorporation. There was no question of control over property, or its uses, and what existed over either by the right of repeal of the acts of incorporation is explained in the Railroad Tax Cases, supra, and will be referred to hereafter.

In Waterworks v. Schottler, 110 U. S. 347, 4 Sup. Ct. 48, the law, under which the corporation plaintiff was organized, provided a special commission to fix water rates. By the constitution of the state, subsequently adopted, that power was given to the board of supervisors of San Francisco. It was held to be a valid exercise of the reserve power to alter or amend the law. The power, abstractly, to regulate rates was not involved (only by what instrumentality, whether by the commission or by the supervisors); and the corporation contended for the commission, because the law incorporating it was a contract, and inviolable. The court, speaking by Mr. Justice Waite, said:

"Long before the constitution of 1879 was adopted in California, statutes had been passed in many of the states requiring water companies, gas companies, and other companies of like character to supply their customers at prices to be fixed by the municipal authorities of the locality; and, as an independent proposition, we see no reason why such a regulation is not within the scope of legislative power, unless prohibited by constitutional limitations or valid contract obligations. Whether expedient or not is a question for the legislature, not the courts."

As to the power of the legislature to fix prices, the court cited and followed Munn v. Illinois, 94 U. S. 113, which, at that time, had not been directly modified, as it came to be afterwards, but, with caution, said:

"What may be done if the municipal authorities do not exercise an honest judgment, or if they fix upon a price which is manifestly unreasonable, need not now be considered; for that proposition is not presented by this record. *The objection is here, not to any improper prices fixed by the officers, but to their power to fix prices at all.*"

I put the last sentence in italics because it distinguishes the case from that at bar. In that at bar the contention is that the railroad commission has the power to fix any prices, or, rather, any rates, proper or improper, and that corporations must submit as a condition of their existence.

Stone v. Wisconsin, 94 U. S. 181, Ruggles v. Illinois, 108 U. S. 526, 2 Sup. Ct. 832, and Tilley v. Railroad Co., 5 Fed. 664, were cases of rates; but they all followed Munn v. Illinois, and were affected by its error, to wit, that the power of regulation of rates was unlimited in the legislature, and hence, this being the extent of the power, it could be exercised, if not expressed in the charter of the corporation, under the reserve right of amendment. But when this power became limited, as it did become limited, first by cautious expressions, as in Waterworks v. Schottler, supra, and the Railroad Commission Cases, then by confident contrary enunciation, as in Chicago, M. & St. P. Ry. Co. v. Minnesota, 134 U. S. 418, 10 Sup.

Ct. 462, 702, constitutional limitations, and all rules which direct justice in the courts, were necessarily observed and enforced. Mr. Justice Waite's monitory words in the Schottler Case have been given. In the Commission Cases he advanced beyond caution, and came nearer to affirmation. He said:

"From what has been said, it is not to be inferred that this power of limitation or regulation is itself without limit. This power to regulate is not a power to destroy, and limitation is not the equivalent of confiscation. Under pretense of regulating fares and freights, the state cannot require a railroad corporation to carry persons or property without reward; neither can they do that which in law amounts to a taking of private property for public use without just compensation, or without due process of law."

Finally, in the Minnesota Case, the supreme court definitely modified Munn v. Illinois, and confined the power of the regulation to that which was just and reasonable, giving to the courts the ultimate power of review, and holding that any enactment which takes away this offends the constitution of the United States by depriving the corporation of its property without due process of law, and depriving it of the equal protection of the laws.

By many decisions since, this has become the settled law, and hence we are brought to the doctrine of the Railroad Tax Cases, and are convinced of the correctness of its soundness, that "whatever the state may do, even with the creations of its own will, it must do in subordination to the inhibitions of the federal constitution,"—a doctrine, rational, consistent, safe, giving to property, and all interests in it, protection against an arbitrary will, and not denying or dissipating the safeguards of the constitution by refined and metaphysical distinctions.

This disposes of what may be termed the "preliminary contentions" of respondents. There are others which will be considered hereafter. There are some urged by complainant. The most extreme one it is difficult to state succinctly and make it understood. The counsel who made it concedes the power of regulation, but very guardedly defines its limits. He says it cannot be exercised to transcend the prohibitions of the fourteenth amendment of the constitution, and, stating it more directly, says, claiming to quote Mr. Justice Field, in Railroad Co. v. Smith, 128 U. S. 179, 180, 9 Sup. Ct. 49, that its only rightful exercise is "to prevent extortion by unreasonable charges, and favoritism by unjust discrimination." This, counsel says, is the fullest power the state has, either by legislature or commission, and the fullest power the state, in reason, should want or exercise. To bring into clear prominence his idea, he stated the value of a railroad to be what it could earn without interference with its rates, under what he termed the normal play of natural and economic laws, and if, exercising this liberty, it treat all alike, then a reduction of its rates would be a taking of property without compensation, or depriving it of the equal protection of the laws. An explanation of these economic laws we need not make, but it is certain that they are not the same for a road which has no competitors as for a road which has competitors, — not the same for monopoly as for competition. In the former

case what certainty would there be of a reduction of rates? That would depend upon the railroad's sense of its own interests and the public interests. This sense might or might not be an enlightened one, might or might not be a liberal one, and economic laws might, therefore, plead in vain for observance. I do not say that they would, but might; and does not experience of the disposition and conduct of men admonish that all power is at times abused? The right—abstract right—of the state, therefore, to reduce rates, seems to be a necessity. Whether it should, in any case, be exercised or not, is another question. Does the right exist? That I think it does, I may have sufficiently indicated in considering the contentions of respondents, and it is only necessary to give my views more definiteness.

We have already seen that Munn v. Illinois was the pioneer case. What it decides, there is no dispute about. The controversy is over how much of it is overruled. The complainant says all of it, and that, by later decisions, the court has adopted and established the views of Mr. Justice Field's dissenting opinion. In the matter with which we are now concerned, I might question the correctness of counsels' interpretation of Mr. Justice Field's opinion, but I prefer to consider, though very briefly, the cases more directly. Munn v. Illinois was a case concerning the reduction of warehouse rates,—not so indisputably a public interest as railroads. It established two propositions: (1) That of the power of the state to regulate property devoted to a public use. (2) That the exercise of this power to settle rates of charge was a legislative prerogative, not a judicial one; that is, there was no review of them by the judiciary. What they were fixed at they could remain fixed at, even though unreasonable, and that the only relief was in the justice of the people, expressed through another legislature. The first proposition, as to the power of the state, has not been overruled. The second proposition, as to its right of exercise without judicial review, has been overruled, and the relations of common carriers and the state established in excellent equipoise. The power of the state stops at injustice. The rights of a railroad stop at injustice. The state may not fix a rate unreasonably low. It may prevent a railroad from fixing one unreasonably high. If the law gives a railroad privileges, it exacts from it duties. It exacts that it serve all at reasonable charge; serve all faithfully, and without favor or discrimination.

The other contentions of the complainant either deny the legality of the commission or the legality of its action. Under the first, it is urged: (1) That the provision of the California constitution, which makes the rates conclusively just and reasonable in all controversies, civil and criminal, is in conflict with the fourteenth amendment of the constitution of the United States. (2) Being void, and being also indissolubly blended with the provisions creating the commission, these are also void. (3) That no notice to the railroads is provided for. (4) That the provisions of the constitution apply to railroads owned by railroad corporations and com-

panies, and not to railroads generally, and that its penalties have also the same discrimination, and hence the complainant is deprived of the equal protection of the laws. Under the second, it is urged that two of the commissioners (La Rue and Stanton) took such a pledge, before election, as to disqualify them from acting, and that La Rue was interested, because a shipper of grain, and hence a judge in his own case; and because the board acted arbitrarily, and contrary to the evidence, or any evidence adduced before the board. It is, in effect, admitted, or, at any rate, it is established by authority, that the provision which gives conclusiveness to the rates fixed by the commissioners, is void; but it is claimed that it is clearly separable from the power to establish rates. The power, and the effect of the exercise of the power, as evidence, and the penalties which may follow from disobedience, are clearly separable, and, being so, one cannot vitiate the other.

In Reagan v. Trust Co., supra, similar contentions were made against a statute of the state of Texas, which established a railroad commission, gave it power to establish rates, made them conclusive as evidence, and prescribed penalties for their disobedience. The enactments were as fully connected and dependent as the provisions of the California constitution. Passing on the contentions, the court said, by Mr. Justice Brewer:

"It is familiar law that one section, or part of an act, may be invalid without affecting the validity of the remaining portion of the statute. Any independent provision may be thus dropped out, if that which is left is fully operative as a law, unless it is evident, from a consideration of all the sections that the legislature would not have enacted that which is within, independently of that beyond its power. Applying this rule, the invalidity of these two provisions may be conceded, without impairing the force of the rest of the act. The creation of a commission, with power to establish rules for the operation of railroads, and to regulate rates, was the prime object of the legislation. This is fully accomplished, whether any penalties are imposed for a violation of the rules prescribed, or whether the rates shall be conclusive or simply prima facie evidence of what is just and reasonable. The matters of penalty, and the effect, as evidence, of the rates, are wholly independent of the rest of the statute. Neither can it be supposed that the legislature would not have established the commission, and given it power over railroads without these independent matters. In other words, it is not to be presumed that the legislature was legislating for the mere sake of imposing penalties; but the penalties and the provision, as to evidence, were simply in aid of the main purpose of the statute. They may fail, and still the great body of the statute have operative force, and the force contemplated by the legislature in its enactment."

It is, however, further urged that the conclusive provision was the main inducement of the others, and that the latter would not have been adopted independently of the others; and, to sustain this view, extracts are given from the speeches of certain of the members of the constitutional convention. They are too long and too many to quote. It is enough to say that they do not go that far, and, besides, the speakers were but a few members of a large convention, and, besides, again, they can be no index of what intention the people had by their adoption of the constitution.

The objection that the provision of the California constitution creating the board of railroad commissioners is invalid, because they do not require notice to the railroads, is certainly doubtful as law,

if it be not disputable as a correct interpretation of those provisions. As law, the objection seems to find some support in the Minnesota Case. The case came up on writ of error to review the decision of the supreme court of Minnesota (37 N. W. 782). That court had decided that it was the expressed intention of the statute of the state that the rates recommended and published by the commission created by it should not simply be advisory, nor merely prima facie equal and reasonable, but final and conclusive as to what are equal and reasonable charges. In other words, to quote from the opinion of the supreme court of the United States, "although the railroad is forbidden to establish rates that are not equal and reasonable, there is no power in the courts to stay the hands of the commission, if it chooses to establish rates that are unequal and unreasonable." It was on account of this meaning of the act that the supreme court held it to conflict with the constitution of the United States. Mr. Justice Blatchford, in comment on the provisions of the statute, said:

"No hearing is provided for; no summons or notice to the company before the commission has found what it is to find, and declared what it is to declare; no opportunity provided for the company to introduce witnesses before the commission; in fact, nothing which has the semblance of due process of law; and although, in the present case, it appears that, prior to the decision of the commission, the company appeared before it, by its agent, and the commission investigated the rates charged by the company for transporting milk, yet it does not appear what the character of the investigation was, or how the result was arrived at."

But it is manifest that this was urged as removing an objection to the final conclusion of the court, not as an essential or basic condition of itself. This conclusion was that "the question of the reasonableness of a rate of charge for transportation by a railroad company, involving, as it does, the element of reasonableness, both as regards the company and as regards the public, is eminently a question for judicial investigation, requiring due process of law for its determination"; and, if deprived of it, the company's property is taken without due process of law, and in violation of the constitution of the United States. This view of the case seems evident from the concluding paragraph of the opinion. Mr. Justice Blatchford said:

"In view of the opinion delivered by that court, it may be impossible for any further proceedings to be taken other than to dismiss the proceeding for a mandamus, if the court should adhere to its opinion that, under the statute, it cannot investigate judicially the reasonableness of the rates fixed by the commission. Still, the question will be open for review."

The question could not be open for review if there was an antecedent defect in the creation of the commission which rendered any exertion of duties invalid because the statute creating it had not provided for notice to the railroads affected by such exertion of duties. But Mr. Justice Miller, in his concurring opinion, is very direct and clear. He said:

"I do not agree that it was necessary to the validity of the action of the commission that previous notice should have been given to all common carriers interested in the rates to be established, nor to any particular one of them, any more than it would have been necessary (which, I think, it is not) for the legis-

lature to have given such notice if it had established such rates by legislative enactment. But when the question becomes a judicial one, and the validity and justice of these rates are to be established or rejected by the judgment of a court, it is necessary that the railroad corporations interested in the fare to be considered should have notice, and have a right to be heard on the question relating to such fare, which I have pointed out as judicial questions. For the refusal of the supreme court of Minnesota to receive evidence on this subject, I think the case ought to be reversed, on the ground that this is a denial of due process of law in a proceeding which takes the property of the company; and, if this be a just construction of the statute of Minnesota, it is for that reason void."

These views seem to satisfy all the purposes of the state, and all the rights of the railroads. The commission undoubtedly exercises a function which the legislature would otherwise exercise. It should be as full with the commission as with the legislature, and, in both, subject to the same judicial investigation, as we have already seen it is, and thereby giving to the railroads that protection to their rights and property which the constitution guaranties.

The third ground urged, to wit, that the constitution is discriminative as to railroads, as they are owned or not owned by corporations or companies, is answered by the interpretation of the provisions by the supreme court of the state in Moran v. Ross, 79 Cal. 163, 21 Pac. 549, in which the court said:

"In our judgment, the control of the railroad commission, as provided for, is not confined to corporations. It extends, by its terms, to railroad corporations and 'transportation companies.' This should be construed to extend the supervision of the commission to all persons engaged in the business of transportation, whether as corporations, joint-stock companies, partnerships, or individuals, and so it has been construed by legislative enactment."

The legislative enactment referred to is the act of April 15, 1880, which was passed under an enabling clause in the constitution. Section 14 of the act, after providing what should be meant and included by the term "transportation companies," further defined the word "company" "to mean and include corporations, associations, partnerships, trustees, agents, assignees, and individuals." This construction is binding upon this court. Chicago, M. & St. P. Ry. Co. v. Minnesota, supra.

As part of the argument against the validity of the state constitution, it is said that it provides "for the fixing of conclusive rates, and rates of that character only; that the word 'reasonable' is not written in the law; that it does not appear there either expressly or by implication." Regarding this objection as not included in those already replied to, it is only necessary to say that the direction to the commissioners to establish rates must be understood as a direction to establish just and reasonable ones. Making the rates conclusive as evidence is a different thing from making them or directing or intending them to be made unreasonable; and the former is held void, not because the rates to which it gives conclusiveness will be unreasonable, but because they may be so, and a judicial investigation is attempted to be prevented.

The other contentions, based on the interest of La Rue, as a shipper of grain, and on the pledges of Stanton before election, are of no especial consequence,—the former because the grain rate resolu-

tion was adopted by an unanimous vote, and the latter because, after all, the final inquiry must be, were the reductions resolved upon reasonable? and we are aided little in that inquiry or into the conditions and circumstances involved in it by a consideration of Mr. Stanton's prejudice or nonprejudice.

This brings us to the other contentions of respondents, and to the merits of the controversy. They are: (1) That (to quote the attorney general) "the term 'unreasonable,' as applied to rates of charges fixed by the legislature, or a body intrusted by a state constitution with that branch of legislation, means nothing more or less than confiscation." In other words, if such rates produce any revenue, much or little, they are reasonable. (2) That they (respondents) are entitled to have the grain rates considered separate from the 25 per cent. resolution; that there must be a showing as to each, not as to both indistinguishably. (3) Even if joined, the showing not sufficient.

1. This is claimed to be established by authority. I do not think so. It seems to have been decided in the Dey Case, 35 Fed. 866. But the same learned judge who expressed that view in the Dey Case retracted it in the Ames Case, 64 Fed. 165, and it has received no judicial sanction since. This was inevitable when it came to be seen that the regulation of rates could not be an absolute legislative prerogative. When the power of judicial review was asserted and entertained, the fourteenth amendment of the constitution was bound to be firmly and accurately applied. There could be no middle ground. Middle ground would satisfy neither legislative prerogative nor judicial prerogative. Certainly not the judicial prerogative. That must apply justice as it is understood of men, and, in its clear light, it was inevitable that it would come to be seen that the fourteenth amendment of the constitution would be a composition of delusive words if it forbade only the taking of the physical property, while it permitted the taking of its value,— if its guaranties of the law's equal protection to all persons would be satisfied as to railroads by leaving them a miscroscopical profit. If so, the pool of Tantalus would lose its force to illustrate excited and disappointed expectation when compared with the organic law of this great land. We should keep in mind that the regulation of a railroad affects, in reality, the natural persons who own it, not the insensible legal artificiality and abstraction called a "corporation." For the natural persons the protection of the constitution is intended, and would any one say that justice is done them if their investment be allowed only an infinitesimal fraction of 1 per cent., while all other investments are expected to return, at least, legal interest, with freedom, besides, of unlimited advantage.

One of the counsel for respondents, at the oral argument, frankly admitted that, if injustice was threatened, all who were in would hurry out of the ownership of railroad property. Of not a dissimilar alternative, Mr. Justice Brewer said, with strong metaphor, that the apples of Sodom were fruits of joy in comparison. That the power of regulating rates was intended to be exerted to that

effect no one will contend for; that it may not be so exerted, safeguards are needed. It is against, not only what may be done, but what can be done, that preventive laws are directed; and, if it be said that justice may be exercised by a legislature or a commission, a sufficient answer is that it is a rule of our polity that the ultimate exercise of that is best committed to the courts. This may offer restraints sometimes, even to good purposes, but would we not be as children, thoughtless and insensible, if we felt the restraints more than the evil they may prevent.

2. The respondents are entitled to have the grain rates considered separately from the 25 per cent. reduction on other freights, but the showing may be good for either, and hence need not distinguish. Mr. Hayne, for the respondents, puts this objection in another form. He says, granting a deficiency of revenues, it does not necessarily appear that this is the result of grain rates; they may be too high; that a determination of the effect of the reduction of them involves an examination of the validity of every other rate. "You do not get any light," the counsel says, "by taking general results, because it is quite consistent with the general result that the grain rates are nine or ten times too high, and that the others may be too low. It may be that the difficulty is in some other rate. If so, the applicant for relief ought to show it." It would seem, also, if this were so, that the respondents might show, and should show it, against the statement of the complainant, that the rates are not discriminative; but another answer is that such a showing would be too extensive for a preliminary inquiry, and absolutely intractable by affidavit. Still another answer is that the action of the board negatives the fact upon which it is based. It does not seem conceivable, if that fact be true, that the board of railroad commissioners would have passed a resolution which, by its horizontal application, preserved, and, may be, intensified whatever discrimination existed between the grain rates and other rates.

3. The attorney general says that he can demonstrate, beyond the possibility of a plausible explanation, that complainant has failed to make such a showing as would entitle it to the relief prayed for, even if the 8 per cent. and 25 per cent. reductions could, under any circumstances, be considered jointly. On the other hand, Mr. Herrin says that complainant is not asking for a single dollar of dividend, because existing rates and business are not sufficient to earn dividends. It only seeks revenue enough to pay interest on bonds, to pay operating expenses, and to pay taxes. Present rates, under the experience of 1894, were insufficient for such payment. The elements of the controversy will be stated as we proceed. It may, however, be premised here that Mr. Justice Brewer said in the Dey Case: "Compensation implies three things,—payment of the cost of service, interest on bonds, and then some dividend;" "adequate dividend," subsequent cases say. These, then, are the factors of compensation to be applied.

Complainant's bill, after a somewhat detailed statement of the amounts payable by complainant under the leases to it, gives a

summary of the receipts and expenditures, which shows a deficiency on the Pacific System for the year of 1894 of $276,262.70; for 1895, $1,476,176.39. In the amendment to the bill there is an exhibit of the receipts and expenditures of the California roads of the system, showing a surplus for 1894 of $434,497.05; for 1895 (ending June 30), a deficit of $863,691.29. The attorney general claims that this showing is incorrect, for three reasons: (1) Because there is included a deficit of the Oregon & California road, in the sum of $541,355.71; (2) because there are included in expenditures on the various roads, for improvements and betterments, the sum of $654,826.81; (3) because there is included in expenditures, as operating expenses, the rent paid to the California Pacific road, in the sum of $600,000. If the last (third) be good, it is conceded that the deficit on the Pacific System, including the other objected items, will amount to $24,131.20. If not good, the deficit will amount to $54,905.65. For the time being, I will assume this objection to be good, and will consider the other objections.

Is the deficit of the Oregon & California road a proper expenditure of complainant, which resulted from the insufficiency of the income to pay the interest on the bonded debt? This, of course, depends upon the terms of the lease from the Oregon & California Company. It provides that the Southern Pacific Company shall pay to the Oregon & California Company, on account of the road, from the income received from it, as follows: The cost of operating such road and incidental expenses connected therewith, and "shall apply the residue of the amount of net income and earnings of said railroads to such extent as shall be required for the purpose, to the payment of the interest, * * * upon the now existing bonded indebtedness." The lease also provided that "on the 1st of May of each year the Southern Pacific Company shall pay to its lessor such balance, if any, of the net income for the year ended the 1st of December preceding, as shall remain in its hands after all the payments for interest * * * agreed to be made or paid." It is, however, further provided that, if the net income be insufficient to pay in full such current interest for the year, it shall be optional with the Southern Pacific Company to advance or pay for account of the Oregon & California Company such deficiency. If, however, it do so, it shall be entitled to interest thereon, at 6 per cent, per annum, until reimbursed, and shall be entitled to pay itself out of subsequent earnings or income of the demised premises, and have a lien thereon, and on such income.

It is objected that the payment of the deficit was optional, and, again, because the amount paid is secured upon future revenues and on the demised premises. In other words, it was not a "payment," in any proper sense, by the Southern Pacific Company for which it could charge. Interest on bonded debt is held by all authorities to be a proper charge upon income, and hence, if the Oregon & California Company had operated its road, such interest could be claimed by it,—deficiency of income to pay such interest would be a loss to the company. But that is not the test. We have already seen (and important consequences follow from it) that the board of rail-

road commissioners dealt with the Pacific System,—dealt with the Southern Pacific Company, as operating that system,—not any individual road, but all the roads; and hence the regulation of the board must be tested by the revenues of all the roads, not by the revenue of one. It is not what the Oregon & California Company might show, or what the Southern Pacific Company might show, for the operation of that road alone, but what it may show as to the system. This being so, the conclusion is obvious. Was the payment of the interest a loss to the Southern Pacific Company? Clearly not. It is secured to it, and is to be reimbursed to it, and is charged in the report as a "Balance deficit payable by Oregon & California Railroad Company." Clearly, again, if it had not been paid, it could not be claimed as a loss. If paid, and to be reimbursed and secured, it cannot be claimed as a loss, if the debtor or the security be good. I cannot assume now that the debtor or the security will not be good. It may be, of course, that it will not be good, but I can only deal with present conditions, or, at any rate, with those likely to occur within a reasonable period of time. That, under the lease, the payment of the deficit is not a charge on the Southern Pacific Company, is not only evident from its terms, but evident from the allegations of the bill.

The second ground of objection, that is, that to improvements and betterments, there will have to be considered—First, the abstract legality of such a charge; and, second, the competency of it under the leases. The abstract legality of such charge is established by the Reagan Case. The same contention was made there, and a deduction of the sum of $302,085.77 was claimed to have been charged to operating expenses, whereas it was expended for "Cost of road, equipment, and permanent improvements." Mr. Justice Brewer, commenting on the claim, said:

"Again, the sum of $302,085.77 appears in that table, under the description 'Cost of road, equipment, and permanent improvements, admitted to have been included in operating expenses,' and is added to the income as though it had been improperly included in operating expenses. But, before this change can be held to be proper, it is well to see what further light is thrown on the matter by other portions of the report. That states that there were no extensions of the road during that year, so that all of this sum was expended upon the road as it was. Among the items going to make up this sum of $302,085.77 is one of $113,212.09 for rails, and it appears from the same report that there was not a dollar expended for rails except as included within this amount. Now, it goes without saying that, in the operation of every road, there is a constant wearing out of the rails, and a constant necessity for replacing old with new. The purchase of these rails may be called "permanent improvements," or by any other name; but they are what is necessary for keeping the road in serviceable condition. Indeed, in another part of the report, under the head of 'Renewals of rails and ties,' is stated the number of tons of 'New rails laid' on the main line. Other items therein are for fencing, grading, bridging, and culvert masonry, bridges and trestles, buildings, furniture, fixtures, etc. It being shown affirmatively that there were no extensions, it is obvious that these expenditures were those necessary for a proper carrying on of the business required of the company."

Substantially to the same effect is Union Pac. Ry. Co. v. U. S., 99 U. S. 402. In the latter case the court was called upon to interpret that clause of the act of 1862 in aid of the construction of the Union

Pacific Railroad, which provided that "after said road is completed, and until said bond and interest are paid, at least 5 per cent. of the net earnings of said roads shall also be applied to the payment thereof." It may be said that there were several elements in that case which are not in the case at bar, but, nevertheless, the remarks Mr. Justice Bradley makes are substantially applicable. Speaking of when a railroad is completed, he said:

"In one sense, a railroad is never completed. There is never, or hardly ever, a time when something more cannot be done, and is not done, to render the most perfect road more complete than it was before. This fact is well exemplified by the history of the early railroads of the country. At first, many of them were constructed with a flat rail or iron bar, laid on wooden stringpieces, resulting in what was known in former times as 'snake heads'; the bars becoming loose, and curving up in such a manner as to be caught by the cars, and forced through the floors amongst the passengers. Then came the T rail, and, finally, the H rail, which itself passed through many successive improvements. Finally, steel rails, in the place of iron rails, have been adopted as the most perfect, durable, safe, and economical rails on extensive lines of road. Bridges were first made of wood, then of stone, then of stone and iron. Grades originally crossed, and, in most cases, do still cross, highways and other roads on the same level. The most improved plan is to have them, by means of bridges, pass over or under intersecting roads. A single track is all that is deemed necessary to begin with; but now no railroad of any pretensions is considered perfect until it has, at least, a double track. Depots and station houses are, at first, mere sheds, which are deemed sufficient to answer the purpose of business. These are succeeded, as the means of the company admit, by commodious station and freight houses, of permanent and ornamental structure. And so the process of improvement goes on; so that it is often a nice question to determine what is meant by a complete, first-class railroad."

And, declaring what are proper expenditures, he further said:

"Having considered the question of receipts or earnings, the next thing in order is the expenditures which are properly chargeable against the gross earnings in order to arrive at the 'net earnings,' as this expression is to be understood within the meaning of the act. As a general proposition, net earnings are the excess of the gross earnings over the expenditures defrayed in producing them, aside from and exclusive of the expenditure of capital laid out in constructing and equipping the works themselves. It may often be difficult to draw a precise line between expenditures for construction and the ordinary expenses incident to operating and maintaining the road and works of a railroad company. Theoretically, the expenses chargeable to earnings include the general expenses of keeping up the organization of the company, and all expenses incurred in operating the works and keeping them in good condition and repair; while expenses chargeable to capital include those which are incurred in the original construction of the works, and in the subsequent enlargement and improvement thereof. With regard to the last-mentioned class of expenditures, however, namely, those which are incurred in enlarging and improving the works, a difference of practice prevails amongst railroad companies. Some charge to construction account every item of expense, and every part and portion of every item, which goes to make the road, or any of its appurtenances or equipments, better than they were before; whilst others charge to ordinary expense account, and against earnings, whatever is taken for these purposes from the earnings, and is not raised upon bonds or issues of stock. The latter method is deemed the most conservative and beneficial for the company, and operates as a restraint against injudicious dividends and the accumulation of a heavy indebtedness. The temptation is to make expenses appear as small as possible, so as to have a large apparent surplus to divide. But it is not regarded as the wisest and most prudent method. The question is one of policy, which is usually left to the discretion of the directors. There is but little danger that any board will cause a very large or undue portion of their earnings to be absorbed in permanent im-

provements. The practice will only extend to those which may be required from time to time by the gradual increase of the company's traffic, the dispatch of business, the public accommodation, and the general permanency and completeness of the works. When any important improvement is needed, such as an additional track, or any other matter which involves a large outlay of money, the owners of the road will hardly forego the entire suspension of dividends in order to raise the requisite funds for those purposes, but will rather take the ordinary course of issuing bonds or additional stock. But for making all ordinary improvements, as well as repairs, it is better for the stockholders, and all those who are interested in the prosperity of the enterprise, that a portion of the earnings should be employed. * * * We are disposed to agree, therefore, with the judge who delivered the concurring opinion in the court below, that the twenty-seventh item of expenditure, as stated in the table of expenses in the eighteenth finding, entitled 'Expenditures for station buildings, shops,' etc., is a charge that may properly be made against earnings; since, as the fact is, such expenditures were actually paid therefrom, and were not carried to capital account."

The same idea is variously illustrated in the following cases: U. S. v. Kansas Pac. R. Co., 99 U. S. 455; St. John v. Railway Co., 22 Wall. 136; Railroad Co. v. Nickals, 119 U. S. 296, 7 Sup. Ct. 209; Warren v. King, 108 U. S. 389, 2 Sup. Ct. 789; Mobile & O. R. Co. v. State of Tennessee, 153 U. S. 495, 14 Sup. Ct. 968; Barnard v. Railroad Co., 7 Allen, 512; Minot v. Paine, 99 Mass. 106, 107; Railway Co. v. Elkins, 37 N. J. Eq. 273; Dent v. London Tramways Co. 16 Ch. Div. 344.

The character of the improvements, as shown by the report, and charged as operating expenses for 1894, is the same as those described in the Reagan Case, and also in Union Pac. Ry. Co. v. U. S. The character of those claimed for 1895 is not so explicitly described, but they may fairly be presumed to be the same.

The competency of the charge under the leases depends, of course, upon their provisions, and a consideration of them will necessarily be somewhat detailed. It is provided in the lease from the Oregon & California Railroad Company that the complainant shall pay out of the earnings and income "the expenses of repairing, maintaining, improving, adding to, and keeping up the said leased railroads, with their appurtenances." Construing this provision by the light of the Reagan Case, and other cases supra, the expenditures made are properly chargeable against the income; nor do I think the subsequent provisions of the lease make those expenditures a lien on future income or on the demised premises, because they only give a lien "for advances to or for the party of the first part for additions or improvement of the demised premises, or any part thereof, * * * *not paid by the party of the second part under the lease.*" The italics are mine, and the provision indicated by them removes the expenditures under the lease from the objection made against them.

The lease of the Central Pacific Company gives more latitude to construction. It is dated the 7th day of December, 1893. But it is the final modification of a lease made on the 17th of February, 1888, and a construction of it is helped by a consideration of the latter. In this it is recited that it is for the mutual advantage of the contracting parties; that neither (to quote its words) is to be

benefited at the expense of the other. This is put as one of the conditions of the letting, and, when it ceases to be that, a modification may be requested. The letting was for the period of 99 years, and under it the Southern Pacific Company incurred many obligations. Among them was one to pay a rental of $1,200,000, to be increased if justified by the income; and that it would "keep and maintain the property hereby leased in good order, condition, and repair; operating, maintaining, and adding to and bettering the same at its own expense." This provision made the improvements and betterments an expense to be borne by the Southern Pacific Company, and hence one to be allowed to it in estimating its gains or losses. But the lease was modified in 1893. It was also modified in 1888, but not in any of the provisions we are now concerned with. In the modification of 1893 it was recited as a reason for it that the Central Pacific Company "has been and is being benefited at the expense of the Southern Pacific Company, and the necessity has therefore arisen for a revision and change of such lease, so that neither party thereto shall be benefited at the expense of the other." The modification then made was radical. Instead of the numerous obligations of the other lease, its large rental, and the larger one of the modification of 1888, and the obligation to add to and better the road at its expense, the Southern Pacific Company only contracted to pay a rental of $10,000, in installments, which was required to be applied by the Central Pacific Company to the expense of maintaining and keeping up its corporate organization. And then it is provided that on the 1st day of April in each year the Southern Pacific Company shall pay to the Central Pacific Company such balance, if any, of the net earnings or income received by it for the year ending the 31st of December then next preceding, as shall remain in its hands after all the payments thereinbefore provided for or agreed or directed to be made. It is further provided that if advances be made by the Southern Pacific Company for the various purposes mentioned in the lease, "to or for or upon the request of" the Central Pacific Company, "other than such as fall within the payments before provided to be made by the lessee out of the earnings or income," the Southern Pacific Company may be entitled to pay to itself with interest. And it is further provided that after the payments are made which are stipulated for, if the balance of the net income exceed 6 per cent. of the par value of the capital stock of the Central Pacific Company, one-half of such excess shall belong to the Southern Pacific Company. The payments and advances made by the Southern Pacific Company are to bear interest at 6 per cent. per annum, and be a lien on the demised premises, and the income thereof, unless there be an agreement in writing to the contrary. It is stipulated that the leases of February, 1885, and January, 1888, be canceled, except as they relate to the operation of the demised premises prior to January 1, 1894, and also that the lease may be at any time modified or canceled. There was another modification which changed paragraph 4, by making the interest on advances lawful interest, instead of 6 per cent., and by omitting the lien on

the demised premises, and by providing for arbitration if the parties could not agree upon the terms of modification.

The difference between the lease as it was first made, and as it became as modified, makes clear the interpretation of the latter. Under the former the Southern Pacific Company was to pay to the Central Pacific Company a rental of $1,200,000, subject to be increased if the revenue justified to a sum not exceeding $2,400,000. Under the latter a rental of $10,000 was to be paid, which was to be applied to a special purpose. Under the former the Southern Pacific Company was to keep, maintain, repair, add to, and better the same at its own expense, pay taxes and all other charges (nearly), and the income of the road was to be its. Under the latter the Southern Pacific Company is to operate the railroad branches and leased lines, and apply the earnings and income derived therefrom to paying all operating expenses thereof, and the incidental expenses connected therewith, including the sums payable for rentals of leased lines, and, according to their lawful priorities, to the payment of the current interest and sinking-fund contributions, or other payments from time to time becoming due and payable from said Central Pacific Railroad Company, whether to the United States of America, or to bondholders or others, during the existence of this lease, and pay the balance of the income to the Central Pacific Company.

It is clear, therefore, that, if the railroad was added to or bettered, it was to be out of the income which the Central Pacific Company was entitled, and which would, if not so expended, be paid to it. It is true that the lease provides for the contingency of the payment of such expense by the Southern Pacific Company, but it also provides for its repayment, so that it is not, in any case, a deduction from its revenue. If it be said that the Reagan Case makes such expenses proper as operating expenses, the answer is, it was competent for the parties to stipulate otherwise; and now to hold it a charge on the Southern Pacific Company would be to restore the liability of the lease as it stood in 1888, and which was altered as far as omissions and explicit enumeration could alter it. Hence it follows that the item of $111,786.71, for betterments and additions to the Central Pacific Company, should not be allowed as an expenditure of the Southern Pacific Company.

Under the lease of the California Pacific road, the Southern Pacific Company is required to "better the same at its own expense." The expenditure, therefore, was by it made, and in its report it was charged to itself. The effect is not altered by the fact that at the end of 50 years the company is to receive the then cash value of the additions and betterments made during the term of those which the report shows were made, and it would be hard guessing to say what traces of them would be left in fifty years.

The lease of the Northern Railway Company provides that additions and betterments are "a charge to the said lessor, and the settlement therefore shall be made annually." They, therefore, should not be allowed to the Southern Pacific Company.

The lease of the Northern California Railroad provides that the

Southern Pacific Company shall "add to and better the same during the term." This expenditure, therefore, is a proper charge of the Southern Pacific Company.

The lease of the Southern Pacific Coast Railroad Company is too long to quote. It is said by counsel for the respondents that it "is a virtual conveyance of the property for the term [55 years], without any recompense to the lessor other than the payment of its annual liabilities, and the guaranty of its bonded indebtedness." Granting this is so, it yet devolves upon the Southern Pacific Company to maintain the road, and the making of such improvements, as have already been described, were a proper expenditure by it, hence a proper item of charge to be made by it.

In the "Omnibus Lease," so called, in which the Southern Pacific Company (of California, Arizona, and New Mexico, respectively) lease to complainant, there is this provision:

"Third. The betterments and additions to said leased properties shall be made by the said Southern Pacific Company, and settlement thereof made annually at the same time that payment is made for the net profits, as herein provided; and each of said railroad companies shall be charged, respectively, with the amount of payments made for betterments and additions to the property owned by it."

This makes the betterments and improvements an expenditure of the several companies, not of the Southern Pacific Company, and therefore not to be allowed to it.

The remaining objection is that made to the rental of $600,000, to be paid to the California Pacific road. There was a somewhat confusing concession made as to this item. Including that item, it was said that the net deficit on that road was $54,905.65, shown by the report. But it was said that, to put the system on a basis of receipts and expenditures, it was improper to include the whole of it, but only the difference between the amount and certain fixed charges, amounting to $347,868.50; that is, $252,131.50. But it is not very clear why the fixed charges should be charged, and the rent not charged, or why the former should be deducted from the latter. As we have seen, and shall see, it is the expenditures of the Southern Pacific Company which we can only consider. Was the rent or were the fixed charges such an expenditure? By the terms of the lease, there was to be paid by the Southern Pacific Company to the California Pacific Company a rental of $600,000 per annum, and it is provided that "it will, during said term, keep and maintain said property in good order, condition, and repair, and operate, add to, and better the same at its own expense, and will pay all taxes legally assessed against or levied thereon." The rent, therefore, is as much an annual expenditure as the taxes and betterments are, and why, then, should it not be allowed, or why should something be allowed out of it, or instead of it, which is not an expenditure to the Southern Pacific Company? The objection to allowing the rental is stated by one of the counsel to be that any rent could be charged or successive lettings be made with successive rentals, and all with the same propriety and legality be charged. Whether this would be done is improbable. That it could be

done legally would depend upon good faith, and the relation and proportion of the rent to the property. I see, therefore, no objection to this charge of $600,000 rental. It is an annual expenditure of the Southern Pacific Company, to be annually reimbursed to it from the income of the road with other expenditures. The deficit on that road, therefore, can be regarded, if the other charges are correct, to be $54,905.65.

The total amount to be deducted from the expenditures of the Southern Pacific Company, on account of betterments and improvements, is as follows:

| | |
|---|---:|
| Central Pacific Company | $ 111,786 71 |
| Northern Railway Company | 21,727 35 |
| Southern Pacific of California | 228,756 68 |
| Southern Pacific of Arizona | 27,571 59 |
| Southern Pacific of New Mexico | 178,766 32 |
| | $ 568,608 65 |
| Adding to this the deficit on the Oregon & California road, to wit | 541,355 71 |
| Makes a total of | $1,109,964 36 |
| Deducting from this | 54,905 65 |
| It leaves as a surplus to the system for 1894 | $1,055,058 71 |

As to the year 1895, the bill alleges as follows:

"That for the first six months of the current year, to wit, from the 1st day of January to the 13th day of June thereof, which is the latest time to which your orator is able to bring down its statistics, the total receipts and expenditures of your orator in the operation of said Pacific System of railroads were as follows, viz.:

Receipts.

| | |
|---|---:|
| Gross earning from operations | $14,727,319 96 |
| Interest and other net income | 64,166 87 |
| Rentals from terminals and other property | 44,638 94 |
| | $14,836,125 77 |

Expenditures.

| | |
|---|---:|
| Operating expenses, renewal and improvements to equipment and roadways | $10,738,982 95 |
| Taxes | 497,040 00 |
| Rentals for railroads, terminals, bridges, and other property | 453,141 41 |
| Interest on bonds | 4,209,804 47 |
| Sinking-fund payments on mortgages of Central Pacific Railroad Company | 113,333 33 |
| Payments to United States for Central Pacific Railroad Company | 300,000 00 |
| | $16,312,302 16 |

—"Thereby leaving a deficiency between the receipts and expenditures of your orator, for said period, of $1,476,176.39."

It is objected by respondents that, by this showing, 1895 cannot be judged, because the difference between receipts and expenditures for operating expenses is greater in the last six months of the year. The percentage of increase in each is given by the attorney general, and admitted by counsel for complainant to be 11 per cent. for receipts, and 3 per cent. for operating expenses. Assuming this increase, the first and last half of 1895 would compare as follows,

including the operating expenses, improvements, and betterments, and excluding fixed charges, such as interest, taxes, and the like:

Receipts from operations for the first half, as per bill........... $14,727,319 96
Operating expenses ......................................... 10,738,982 95
Eleven per cent. increase of receipts from operations, second half
   of year ................................................ 1,620,005 20
Three per cent. increase of expenses........................ 322,169 49

These amounts, added to those of the bill, give us receipts and expenses for the last half of the year as follows:

Receipts ................................................ $16,347,325 16
Expenses ............................................... 11,061,152 44
The total receipts for the year from operations, then, would be.... 31,074,645 12
Operating expenses ....................................... 21,801,135 89

To earnings from operations must be added receipts from other sources. These are stated in the bill to be, for the first half of the year, as follows:

Interest and other net income.................................... $ 64,166 87
Rentals from terminals and other property....................... 44,638 94
   Total ................................................... $108,805 81
Assuming that the same amounts would be received from the same
   sources, we would have, as the amount to be added to earnings.... $217,611 62

To expenses must be added the expenditures for other purposes than operation. These are stated in the bill to be as follows:

Taxes ......................................................... $ 497,040 00
Rentals for railroads, terminals, bridges, and other property....... 453,141 41
Interest on bonds............................................. 4,209,804 47
Sinking-fund payments on mortgages of Central Pacific Railroad
   Company ................................................ 113,333 33
Payments to United States for Central Pacific Railroad Company.. 300,000 00
   Total ................................................... $5,573,319 21
Assuming that there must be a like expenditure for like purposes
   for the second half of the year, and the total expenditures would
   be .................................................... $11,146,638 40

Making these additions, respectively, to earnings from operation and expense of operation, and the receipts and expenditures for 1895 would be as follows:

Receipts ................................................ $31,294,256 74
Expenses ............................................... 32,949,774 31
   Making a deficit of ...................................... $ 1,655,517 57

In this computation there is allowed, as an expenditure, the improvements and betterments, and also, it may be assumed, a payment of interest on the bonded debt of the Oregon & California road. If these may be assumed to be the same as in 1894 (the betterments were probably less; the deficit, on account of the payment of interest, was probably more), the following deduction from expenditure should be made:

For improvements and betterments.......................... $ 568,608 65
Oregon & California deficit.................................. 541,355 71
   Total ................................................... $1,109,964 36
This would make the true deficit for 1895 on the Pacific System... $545,553 21

On the argument complainant's counsel claimed to be shown by the report, as per the following table:

| | S. P. of Cal. | C. P. R. R. | Nor. Ry. |
|---|---|---|---|
| Land Dept. Ex. | $ 44,716 38 | | |
| Corporation Ex | 29,523 34 | $ 43,263 83 | |
| Taxes on land | 13,186 57 | 17,510 98 | |
| Back taxes | 218,384 20 | 220,612 29 | $20,205 32 |
| Totals | $305,810 46 | $281,387 10 | $20,205 32 |
| Less Mis. Receipts, etc. (p. 117) | | 64,069 90 | |
| (This is for whole road) | | | |
| | | $217,317 20 | |

Summary.

| | |
|---|---|
| S. P. of Cal. | $305,810 46 |
| C. P. R. R. | 217,317 20 |
| Nor. Ry. | 20,205 32 |
| Total | $543,332 98 |

For 1895 they claimed back taxes payable under a late decision of the supreme court, as follows:

| | |
|---|---|
| Central Pacific Railroad | $198,161 18 |
| Southern Pacific of California | 166,904 81 |
| | $365,065 99 |

It is seriously disputable whether land office expenses or taxes on lands are a proper expenditure. If so, land department revenues should be a proper receipt; and, if they be appropriated to a particular purpose, it should only be the net revenues after the expenses of sale. Taxes on any year are, undoubtedly, a proper charge against that year, but it is very doubtful if the accumulation of many years can be charged against a particular one. However, it is not necessary now to decisively pass upon these points.

The bill alleges:

"That the earnings and expenses of said railroads entirely within the state of California, received and paid by complainant during the six months ending June 30, 1895, were as follows, to wit:

Receipts.

| | |
|---|---|
| Gross earnings from operations | $9,785,539 99 |
| Interest and other net income | 102,432 89 |
| Rentals from terminals and other property | 44,638 94 |
| | $9,932,611 82 |

Expenditures.

| | |
|---|---|
| Operating expenses, renewals, and improvements to equipment and roadway | $ 7,137,853 49 |
| Taxes | 334,572 68 |
| Rentals for railroads, terminals, bridges, and other property | 398,447 39 |
| Interest on bonds | 2,742,929 55 |
| Sinking-fund payments on mortgage of C. P. R. R. Co. | 92,500 00 |
| Payments to United States for C. P. R. R. Co. | 90,000 00 |
| | $10,796,303 11 |

—"Thereby leaving a deficiency between the receipts and expenditures of your orator, upon said lines, for said period of six months, ending June 30, 1895, of $863,691.29."

If we make the same percentage of increase to ascertain the receipts and expenses of the last half of the year, as we did for the Pacific System, the result will be as follows:

Receipts.

Earnings from operations first half of year....................$ 9,785,539 99
Second half ........................................................ 10,861,409 39
From other sources................................................ 294,143 66

 Total .........................................................$20,941,093 04

Expenditures.

Operating expenses, renewals, and improvements to equipment and
 roadbed, first half of year........................................$ 7,137,853 49
For second half of year........................................... 7,351,989 09
Other expenses .................................................... 7,316,899 24

 Total ........................................................$21,806,741 82
Making a deficit of.................................................. $865,648 78

From this, improvements and betterments must be deducted; and assuming these to be the same as on the California roads in 1894, but which are probably less, they amount as follows, omitting those on the Central Pacific Railway Company:

The S. P. R. R. Co. of California................................$228,756 68
Northern Railway Company........................................ 21,727 35

 Total .......................................................$250,484 03

The expenditure for betterments and improvements on the Central Pacific Railroad Company was $111,786.71; but all of this cannot be assigned to California. The road is 1,359.05 miles long, of which 757.09 miles are in California; so, disregarding fractions of miles, the amount of the expenditure to be assigned to California is $62,-268.24, making the total amount to be deducted for betterments and improvements $312,752.27, which makes the deficit for 1895, from the operation of the roads entirely in California, $552,896.51. In this computation are not included land department expenses, taxes on land, back taxes, or taxes on franchises held legal by the supreme court.

From this showing it is perfectly evident that there should be no reduction of rates of the Southern Pacific Company, either regarding the Pacific System or the California roads, unless its business increase. Is there a prospect of that so near that the court will be justified in dissolving or withholding its injunction against the new rates? It is alleged in the bill that, when the rates in California were established by complainant, they "were no more than sufficient to enable your orator to operate said railroads as aforesaid, and so remained down to the commencement of the year 1894; that in said year an unusual depression in business occurred, and the freight and passengers offered to your orator for transportation over said railroads were so reduced in quantity and number that your orator was unable, from the income derived therefrom, at the rates aforesaid, to pay the charges, costs, and expenses necessary for the conduct of its business, and the security of its property, as here-

inbefore set forth; that said business depression has continued to the present time, and there is no indication that it will be relieved, or the volume of freight and passenger traffic be increased, during the present or the next ensuing year; and your orator is informed and believes, and therefore avers, that said business depression will not be relieved, or such freight and passenger traffic be increased, during the present or the next ensuing year." These allegations of the depression of business, and the possibilities of its continuance, were attempted to be supported or denied by the respective parties by affidavits, necessarily more or less speculative and conjectural; and the power of the court to take judicial notice of it, and make special applications of it, was asserted or denied. But there need be no conjecture, nor need the court resort to any but the ordinary methods of proof. The business of the complainant has certainly decreased, as is apparent from the evidence. How 1894 compared with 1893 I do not know. How 1894 compared with 1895 has been shown, and the difference is easily understood and accounted for. It could have no other cause but a depression in business, affecting the market and transportation of all articles.

The depression existed when the bill in this case was filed, to wit, October 14, 1895, and there has been nothing offered to show a change. I may not assume one, even from the sources of judicial notice, so definite as to time or amount as to determine a judicial view or action. But this is not seriously important. The regulation of the rates on classes of freight, other than grain, does not now embarrass our consideration. Before final action shall be determined or taken on them by the board of commissioners, before they shall be expressed in a schedule, this case can be tried. Before any considerable movement in grain it can be tried, and the conclusions from this preliminary showing be confirmed or refuted, and a final injunction be granted or denied. I cannot refrain from saying to that opportunity and time the parties to this suit should eagerly look and eagerly prepare. Great problems are awaiting solution, which will receive their solution, or commence to receive their solution, then, and by it. Then, and by it, will be shown whether that allegation of the complainant be true:

"That the rates now in force upon the several railroads operated by it, as aforesaid, have been fixed according to circumstances and conditions surrounding the traffic, and with a careful regard for the financial, commercial, and competitive conditions which enter into, affect, or control the making and relative adjustment of rates and classifications and commodities in the territory traversed by said railroads, and are equitable and fair to the patrons of said railroads, and in many cases are now fixed at the actual cost of transportation, by reason of competition with other carriers, by railroad and water." Or that other averment of respondents be true, that "affiant is informed and believes, and the history of the complainant corporation in this state, with which he is familiar, confirms him in such belief, and he therefore avers, that in many cases the rate of transportation is fixed at about the actual cost of such transportation, at points where it is the interest and object of complainant to crush out opposition, and destroy the property of competing common carriers; and that large expenditures of money have been made, which were unwarranted and uncalled for by the commercial conditions existing at the present time or in the near future; but that such expenditures were made, and large properties created, for the purpose of destroying competition, and destroying the property interests of

others who enter into competition as common carriers, and the discriminating rates are made in favor of persons and places which approximate the cost of transportation, with the view to serve the ends and objects of this complainant in the creation of a monopoly, and the losses entailed by such reduction of rates, and discrimination and creation of property are unjustly and unreasonably fixed upon charges of freights and rates in other portions of the state, that the revenue of this complainant corporation may be maintained without regard to the true interests of commerce, and the rights of the public, or the justness or reasonableness of the rates of charges for the transportation of freight within the state of California."

The view I have taken of the showing made by the complainant makes it unnecessary to consider that made by the United States. In the latter there are elements which are not in the former, and to give them proper attention would delay the decision too long. Besides, the right of the government to intervene was again challenged by respondents, and with such strength of objection (although supported with ability) as to justify a review of its allowance, but which I think is better postponed to a later stage of the case.

The order of the court, therefore, is that that part of the order staying the execution of the resolution of the board of railroad commissioners, reducing rates on grain 8 per cent., be continued until the further order of the court; that the balance of the restraining order be dissolved.