HOOKER et al. v. INTERSTATE COMMERCE COMMISSION et al.

(Commerce Court.　July 20, 1911.)

No. 5.

1. COMMERCE (§ 95*)—INTERSTATE COMMERCE—RATES—JURISDICTION TO FIX.
Power to establish reasonable and just rates for the future transportation of interstate commerce by common carriers is vested in the Interstate Commerce Commission, and not in the Commerce Court.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 95.*]

2. CONSTITUTIONAL LAW (§ 298*)—INTERSTATE COMMERCE—RATES—CONSTITUTIONAL RATE.
It is no answer to a shipper's right to contest the validity of a freight rate imposed for the transportation of interstate commerce, on the ground that it is so high as to operate as a taking of his property without due process of law and without full compensation, that if he is not willing to pay the rate he is not obliged to ship.

[Ed. Note.—For other cases, see Constitutional Law, Dec. Dig. § 298.*
Regulations as to transportation of property as interference with interstate commerce, see note to Rupert v. United States, 104 C. C. A. 259.]

3. CARRIERS (§ 26*)—INTERSTATE COMMERCE—REASONABLE RATES.
In determining the reasonableness of a freight rate between specified points, the Interstate Commerce Commission is not limited to the requirements of a particular carrier or to the question whether a lesser rate would be remunerative to a particular carrier, but should, in addition, consider the rates in the particular territory to be affected by a change of a rate or rates in question.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 67–82; Dec. Dig. § 26.*]

4. EVIDENCE (§ 20*)—JUDICIAL NOTICE—INTERSTATE FREIGHT RATES.
The Commerce Court will take judicial notice that interstate rates prescribed for the transportation of freight by a common carrier must be more or less interdependent, or at least be so related with each other that the rate-making power will not, simply because it has the power, fix a rate on a single line of railroad which will necessarily disorganize reasonable rates on other railroads in the same territory.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 24; Dec. Dig. § 20.*]

5. EVIDENCE (§ 83*)—INTERSTATE FREIGHT RATES—PRESUMPTION.
All interstate freight rates established in accordance with law are presumed to be just and reasonable.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 105; Dec. Dig. § 83.*]

6. COMMERCE (§ 91*)—FREIGHT RATES—ESTABLISHMENT BY INTERSTATE COMMERCE COMMISSION—REVIEW.
Since the fixing of a schedule of interstate rates by the Interstate Commerce Commission is a legislative act, such schedule cannot be disturbed by the commerce court on complaint of a shipper as unconstitutionally high unless it clearly appears that the rates so fixed are so high as to be violative of the shipper's constitutional rights, guaranteed by the fifth amendment to the federal Constitution.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 91.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

7. CONSTITUTIONAL LAW (§ 298*)—INTERSTATE RATES—VALIDITY.

Interstate Commerce Commission order February 17, 1910, establishing a maximum first-class rate of 70 cents per hundredweight between Cincinnati and Chattanooga, and proportionate rates for other classes, *held* not so unreasonably high as to constitute a deprivation of shippers' property without compensation, etc., when considered in accordance with the earning power of all the carriers serving such territory.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 847; Dec. Dig. § 298.*

What constitutes an unlawful preference or discrimination by a carrier under interstate commerce regulations, see note to Gamble Robinson Co. v. Chicago & N. W. Ry. Co., 94 C. C. A. 230.]

Archbald and Mack, Judges, dissenting.

Bill by James J. Hooker and others, officers of the Receivers' & Shippers' Association, against the Interstate Commerce Commission and others to compel the annulment of class rates fixed by the Interstate Commerce Commission between Cincinnati, Ohio, and Chattanooga, Tenn. Dismissed.

Francis B. James, for petitioner.

R. Walton Moore and Frank W. Gwathmey, for Cincinnati, N. O. & T. P. Ry. Co.

J. A. Fowler, Asst. Atty. Gen., and Blackburn Esterline, Sp. Asst. Atty. Gen., for United States.

P. J. Farrell, for Interstate Commerce Commission.

Before KNAPP, Presiding Judge, and ARCHBALD, HUNT, CARLAND, and MACK, Associate Judges.

CARLAND, Judge. In this opinion, for the sake of brevity, the Cincinnati, New Orleans & Texas Pacific Railway Company will be abbreviated C., N. O. & T. P., the Interstate Commerce Commission will be abbreviated Commission, the Louisville & Nashville Railway Company will be abbreviated L. & N., and the Nashville, Chattanooga & St. Louis Railway Company will be abbreviated N., C. & St. L.

Petitioners are firms, partnerships, and corporations engaged in various kinds of mercantile, commercial, industrial, and manufacturing pursuits in Hamilton county, Ohio, and manufacture and produce goods, wares, and merchandise, and sell annually large quantities thereof of great value, alleged in the bill to be several hundred thousand dollars, to purchasers located at Chattanooga, Tenn., which said goods, wares, and merchandise are enumerated in the freight tariffs and classifications governing the same of the respondent C., N. O. & T. P. Said petitioners have invested in building up and maintaining their respective lines of business an amount exceeding the sum of $25,000,000.

The C., N. O. & T. P. is a corporation duly organized under the laws of the state of Ohio, and is a common carrier engaged in the transportation of goods, wares, and merchandise by railroad from the city of Cincinnati, Ohio, to the city of Chattanooga, Tenn., the north-

ern terminus of said C., N. O. & T. P. being at Cincinnati and the southern at Chattanooga.

On the 14th day of July, 1910, petitioners filed their bill of complaint in the Circuit Court of the United States for the Southern District of Ohio, Western Division, for the purpose of obtaining a judgment of that court setting aside and annulling an order of the Commission dated February 17, 1910, but in fact rendered May 24, 1910, and which order is in the following language:

"This case being at issue upon complaint and answers on file, and having been duly heard and submitted by the parties, and full investigation of the matters and things involved having been had, and the Commission having on the date hereof made and filed a report containing its findings of fact and conclusions thereon, which said report is hereby referred to and made a part hereof, and having found that the present rates of defendant the Cincinnati, New Orleans & Texas Pacific Railway Company (lessee of the Cincinnati Southern Railway) for the transportation of articles in the numbered classes of the Southern Classification from Cincinnati, Ohio, to Chattanooga, Tenn., are, to the extent that said rates exceed the rates named in paragraph 3 hereof, unjust and unreasonable.

"(2) It is ordered, that said defendant be, and it is hereby, notified and required to cease and desist, on or before the 15th day of July, 1910, and for a period of not less than two years thereafter abstain, from exacting its present rates for the transportation of articles in the numbered classes of the Southern Classification from Cincinnati, Ohio, to Chattanooga, Tenn.

"(3) It is further ordered, that said defendant be, and it is hereby, notified and required to establish, on or before the 15th day of July, 1910, and maintain in force thereafter during a period of not less than two years, rates for the transportation of articles in the numbered classes of the Southern Classification from Cincinnati, Ohio, to Chattanooga, Tenn., which shall not exceed the following, in cents per 100 pounds, to wit:

| Class | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Rate | 70 | 60 | 53 | 44 | 38 | 29" |

The C., N. O. & T. P. and the Commission filed demurrers to the bill. Subsequently the case was transferred to this court under the provisions of section 6 of the act to create a Commerce Court and to amend the act entitled "An act to regulate commerce (Act June 18, 1910, c. 309, 36 Stat. 544)," and the cause has now been submitted for decision upon the bill and demurrers.

The bill of complaint is quite voluminous, consisting, exclusive of exhibits, of 66 printed pages. The material allegations, however, which in our judgment are necessary to be considered in order to dispose of the case, may be stated briefly as follows:

In 1894 the Commission decided the cases of Cincinnati Freight Bureau v. C., N. O. & T. P., and Chicago Freight Bureau v. L. & N. et al., 6 Interst. Com. R. 195. These proceedings had been instituted by the commercial interests of Cincinnati and Chicago for the purpose of correcting an alleged discrimination in rates upon the numbered classes from points of origin in the Central West as compared with rates from points of origin in the East, to southern territory. The complaint of the Chicago Freight Bureau alleged that the rates for the transportation of freight from western to southern points upon the numbered classes from Cincinnati and other Ohio river crossings to southern points of destination were excessive, and that

the rates from Chicago were even more excessive. Under this alle-gation the Commission held that it might inquire into the inherent reasonableness of these rates, and proceeded to dispose of the case upon that ground. The Commission held that the rates from Cincinnati were too high and should be materially reduced. The following are the rates then in effect from Cincinnati to Chattanooga and those ordered by the Commission, showing the reductions made:

| Classes | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Rates in effect | 76 | 65 | 57 | 47 | 40 | 30 |
| Reduced rates | 60 | 54 | 40 | 30 | 24 | 22 |
| Reductions | 16 | 11 | 17 | 17 | 16 | 8 |

The order of the Commission, made in pursuance of this decision, was not complied with by the carriers, and the Commission thereupon instituted proceedings in the Circuit Court for the Southern District of Ohio to enforce obedience to its requirements. Such proceedings were had in that suit that the Supreme Court of the United States finally directed a dismissal of the bill of complaint upon the ground that the act to regulate commerce as it then stood conferred no authority upon the Commission to establish a rate for the future; that this order was in effect the fixing of a future rate, and therefore without warrant of law, and void. I. C. C. v. C., N. O. & T. P., 167 U. S. 479, 17 Sup. Ct. 896, 42 L. Ed. 243.

When the interstate commerce law was amended in 1906 by giving to the Commission power to fix and establish a rate for the future, the Receivers' & Shippers' Association of Cincinnati commenced proceedings before the Commission and against the C., N. O. & T. P. and the Southern Railway Co. for the purpose of obtaining the benefit of the holding of the Commission in the former case. As a result of a hearing had by the Commission in the proceedings last mentioned, the order complained of in this action was made.

It is claimed by the petitioners that the maximum rate fixed by said order is much too high and is extortionate, so much so that the Commission in making the order violated the fifth amendment to the Constitution of the United States, which prohibits the taking of private property without due process of law or without just compensation. While said order of the Commission was in full force and unsuspended in any way, the C., N. O. & T. P. put into effect a schedule of rates for the transportation of freight between Cincinnati, Ohio, and Chattanooga, Tenn., in accordance with the maximum fixed by the Commission, and said rates are still in force.

In the report of the Commission, which is made a part of said order, it is found as follows: .

"If it is our duty to take this railroad by itself and to determine the reasonableness of these rates by reference to cost of construction, cost of maintenance, and profit upon the investment, we think the complainants have established their case and that these rates ought fairly to be reduced by as great an amount as was formerly found reasonable by this Commission."

This language of the report refers to the finding made by the Commission in 1894, and the reductions made then by the Commission appear in the table heretofore mentioned in this opinion.

The bill in this case also alleges that if the schedule of rates fixed by the Commission in 1894 had been in force or had been applied during the years 1903 to 1908, both inclusive, the yearly average net profit of the C., N. O. & T. P. would have been 40.66 per cent. It also appears from the bill of complaint that the city of Cincinnati owns the line of railroad between the city of Cincinnati, Ohio, and the city of Chattanooga, Tenn., which is commonly known as the Cincinnati Southern, and now and during the times mentioned in the bill operated by the C., N. O. & T. P. The road originally cost the city of Cincinnati $18,000,000, and the city subsequently spent for terminal facilities $2,500,000, making a total cost of the Cincinnati Southern to the city of Cincinnati of $20,500,000. The C., N. O. & T. P. leased this property, and is still leasing it, and the basis of rental returned to the city of Cincinnati prior to 1906 was 6 per cent., and 5 per cent. subsequent to that date. The C., N. O. & T. P. owns its own equipment and never did have any interest in the Cincinnati Southern beyond the right to use the property under the terms of the leasehold. The capital stock of the C., N. O. & T. P. for the years 1903 to 1908, both inclusive, was $5,000,000, divided into $3,000,000 of common stock and $2,000,000 of preferred stock, and about the year 1908 it increased its capital stock by adding $500,000 of preferred stock, making its entire issued capital stock for 1908 $5,500,000. The value of the property of the C., N. O. & T. P. between the years 1903 and 1908, both inclusive, was $5,000,000, and after 1908 was $5,500,000, and was all the property of the C., N. O. & T. P. devoted to and employed in the public service and use and for the public convenience.

The C., N. O. & T. P. is a single-track railroad from Cincinnati to Chattanooga, a distance of 336 miles, without branches, and has an average gross earning per mile of $26,082.66. The L. & N. runs from Cincinnati to Louisville, and from Louisville to Nashville, the distance from Cincinnati to Louisville being 114 miles and the distance from Louisville to Nashville being 185.9 miles. The distance from Cincinnati to Nashville via the L. & N. is thus shown to be 299.9 miles. Nashville is connected with Chattanooga by the N., C. & St. L., the distance from Nashville to Chattanooga being 151 miles, making the distance from Cincinnati to Chattanooga, via the L. & N. from Cincinnati to Louisville and Louisville to Nashville, and from Nashville to Chattanooga over the N., C. & St. L., 450.9 miles. The direct haul from Cincinnati to Chattanooga via the C., N. O. & T. P. is thus 114.9 miles shorter than the indirect haul via the L. & N. and the N., C. & St. L. by way of Louisville and Nashville. The average gross earnings, per mile, between Cincinnati and Chattanooga via the L. & N. and the N., C. & St. L. is $25,593.40.

[1] In view of the finding of the Commission heretofore mentioned, it necessarily follows that its order ought to have followed its findings, unless the reasons stated by the Commission for not doing so are valid. In this connection it must be remembered, however, that the power to establish reasonable and just rates for the future

for the transportation of freight by common carriers is vested by law in the Commission and no part thereof is vested in this court, and this court may not disturb the order complained of unless it can be clearly found that it conflicts with the provisions of the fifth amendment to the Constitution of the United States, providing the power conferred has been regularly exercised. The order of the Commission itself does not fix a schedule of rates to be put in effect by the C., N. O. & T. P., but simply fixes a maximum rate beyond which the railroad may not go. The railroad, however, upon the making of this order established the schedule of rates as high as the order would permit, and therefore it may be truly said that the schedule of rates put in effect by the railway company is the schedule of rates made by the Commission or at least authorized by it. All that this court could do if it found the maximum schedule fixed by the Commission violated the constitutional rights of shippers over the C., N. O. & T. P. would be to set aside the order; but as the rates prescribed thereby have already gone into effect, and as this court has no authority or power to establish rates or to order that any particular rate be put in effect, it necessarily results that the rates now in effect on the C., N. O. & T. P. would continue in effect unless changed by the carrier or the Commission. The carrier could change its rates if the order was set aside and even make them higher than they are now. The Commission could again investigate the matter and fix a new schedule of rates. So that it appears that all the shippers would gain in this litigation would be the vacation of the order, and if the court held that the rates permitted were so high as to be violative in a constitutional sense of the rights of the shippers then no doubt the Commission would not again establish such a high schedule of rates. But in any event if we should set aside the order on constitutional grounds the shippers would be obliged to go again to the Commission for relief. At first we were inclined to think that the result which would be obtained by a successful termination of this suit in behalf of the shippers would be so inconsequential as to render it unnecessary for this Court to take jurisdiction over the case, but upon further reflection it would seem that the shippers have the right to a judgment of this court as to whether or not the schedule of rates contained in the order complained of is so high as to be violative of the fifth amendment to the Constitution as to the difference between what the Commission found would be reasonable if they considered the C., N. O. & T. P. by itself and the maximum rates that were fixed. Then if the shippers again went before the Commission they would have the benefit of the judgment of this court upon that subject. And in that view we proceed to consider the question as to whether the reasons given by the Commission for not reducing the schedule of rates for the classes mentioned to the sums which the Commission found would be reasonable if the C., N. O. & T. P. should be considered by itself are valid.

It is claimed by the petitioners that the Commission, having found that the so-called 60-cent schedule would be reasonable for the C.,

N. O. & T. P. considered by itself, was bound to establish such schedule as the result of its finding, and that the Commission's establishing a higher schedule for the reasons mentioned in its report, while seemingly within its power to fix a reasonable rate, was really and in fact beyond its power, as the Commission had no right to take into consideration in fixing a higher schedule the matters which induced it to make the order which it did.

There are two questions which are presented to this court for decision: First. Are the reasons given by the Commission for the establishment of the schedule mentioned in the order valid, or are they so outside and beyond the power of the Commission to fix a reasonable rate as to come within the rule that prohibits the Commission from fixing a rate for reasons which the Commission is not authorized to consider? Southern Pacific Co. v. I. C. C., 219 U. S. 433, 31 Sup. Ct. 288, 55 L. Ed. ——. Second. Is it shown, beyond reasonable question, by the present record that the schedule of rates contained in the order of the Commission complained of clearly violates the fifth amendment to the Constitution of the United States by taking the property· of petitioners without due process of law or without just compensation if the taking is for a public purpose?

[2] It seems to have been decided in the case of Board of Railroad Commissioners of the State of Kansas v. Symms Grocery Co. et al., 53 Kan. 207, 35 Pac. 217, that the shipper cannot invoke these constitutional provisions for the reason that he is not obliged to ship; that he may utilize the rate prescribed or he may not. We are not impressed with the soundness of this decision. The logical result of such a holding as applied to the facts in the present case would be equivalent to saying to the shipper, "You may pay· an unconstitutional rate or go out of business;" and we do not think that the protection of the Constitution is held on any such condition.

In stating the reasons which in the judgment of the Commission compelled it to take into account in fixing the schedule of rates which it did other considerations and other railroads than the C., N. O. & T. P., we can do no better than to quote from the report of the Commission, as follows:

"The defendants also contend that these rates should be fixed not only with reference to the financial results and the financial necessities of the Cincinnati, New Orleans & Texas Pacific Company, but also with reference to other companies whose rates are necessarily affected by these; otherwise stated, the Commission should establish rates which are just and reasonable for the section in which they prevail. If a particular company is so situated that it can make a handsome profit under such rates, that is the good fortune of that company, just as it would be the misfortune of some other company if it could not show as favorable earnings.

"The rate from Cincinnati and Louisville to Chattanooga has been the same for the last 28 years. The distance is substantially the same, and this relation in rates will undoubtedly be maintained in the future. Whatever reduction is made from Cincinnati will be met by corresponding reductions from other Ohio river crossings. Rates from Memphis to Chattanooga are lower by a fixed differential than from the Ohio River, and this relation would undoubtedly be preserved, and perhaps ought to be, since the distance is 300 miles as against 336 miles from Cincinnati.

"In the original case the Commission ordered reductions to many other points besides Chattanooga. While Chattanooga is the only southern point of destination referred to in these complaints, it is frankly stated that the purpose is to obtain a general reduction to this southeastern territory; and no reason is apparent why, if the Commission adheres to its former decision in case of Chattanooga, it ought not to do the same in case of other localities in this territory. It will be remembered that in 1905 certain reductions were made from the Ohio river to Atlanta without any corresponding reductions to Chattanooga. Originally, the same rate had been made to Atlanta from Louisville as was made from Baltimore. After the opening of the Cincinnati Southern this same rate was applied from Cincinnati to Atlanta, and the rate from Cincinnati to Chattanooga was constructed by using the same rate per mile, although the distance was shorter. At the present time the rate per mile is greater in case of Chattanooga than in case of Atlanta. The defendants say that the present rate is constructed upon the proper basis, and that the reductions made to Atlanta could not be applied to Chattanooga without undoing what was accomplished at that time, for the following reasons:

"The reductions of 1905 grew out of the claim upon the part of Atlanta that its rates from the north were too high in comparison with Birmingham and Montgomery. By that readjustment Atlanta was made the same as Montgomery, and the difference between Atlanta and Birmingham reduced.

"The distance from Memphis to Birmingham is 251 miles, from Memphis to Chattanooga 300 miles, from Cincinnati to Chattanooga 336 miles. The rate from Memphis to Chattanooga has always been somewhat less than that from Cincinnati, in recognition of the shorter distance, and the St. Louis & San Francisco Railway insists that the rate from Memphis to Birmingham shall not materially exceed the rate from Memphis to Chattanooga, which seems reasonable in view of the fact that the distance is 50 miles shorter. If, now, this rate from Cincinnati to Chattanooga is reduced, that will in all probability carry with it a reduction from Memphis to Chattanooga, which will involve a corresponding reduction from Memphis to Birmingham, and this will create the same discrimination out of which the reduction of 1905 came. This would mean a reopening of that contest.

"It must also be remembered that any reduction from the north to Atlanta and corresponding territory would undoubtedly be followed by similar reductions from the East as was the case in 1905.

"It is apparent, therefore, to make any considerable change in this rate from Cincinnati to Chattanooga will work a lowering in rates throughout this entire southern territory, or will produce a change in the relation of those rates which now seem to be adjusted upon a basis fairly satisfactory to that territory. How far are we at liberty to consider all this in fixing a reasonable rate over the Cincinnati, New Orleans & Texas Pacific? It should be noted that Chattanooga is not complaining of unfair treatment as compared with other southern points.

"Some indignation was expressed by several witnesses upon the part of the city of Cincinnati because after that community had expended this enormous amount of money in the construction of the Cincinnati Southern Railroad that property was not more devoted to the interests of the city of Cincinnati. If that city, under proper legislative authority, had seen fit to operate its railroad, it might have established to Chattanooga whatever rates it saw fit, and if the results of municipal operation had been as favorable as the present, it could have materially reduced those rates and still obtained a fair return upon its investment. Such a reduction would have cheapened the cost of this freight to the dealer and probably in a degree to the consumer, and so might have benefited the ultimate consuming public. It is doubtful if it would have benefited the interests of Cincinnati, since the rates established by it would have been met by carriers serving rival communities, and the relation of rates would have continued the same. However this may be, the city has parted with its right to operate this property, and the matter stands exactly as though this road had been built by private capital.

"In the Matter of Proposed Advances in Freight Rates, 9 Interst. Com. R.

382, the Commission, having under consideration the rates on grain from Chicago to the Atlantic seaboard, announced that the interests of all competing lines must be considered in determining the reasonableness of those rates, and not merely that line which could handle the business the cheapest. In the Spokane Case, 15 Interst. Com. R. 376, the same subject was considered and the same conclusion reached. The last affirmance of this doctrine is found in Kindel v. N. Y., N. H. & H. R. R. Co., 15 Interst. Com. R. 555, in which the rule is stated by Clark, Commissioner, as follows:

" 'In the Spokane Case (15 Interst. Com. R. 376) we held that the reasonableness of a rate between two points, served by two or more carriers, could not be determined by consideration alone of that line which is shortest and most favorably situated as to operation, earnings, etc., but that the entire situation must be considered.  *  *  *

" 'As before suggested, we cannot, in determining competitive rates, select that railroad which is the shortest or most advantageously situated, and limit the rate to what would allow that property fair earnings. We must consider the entire situation, and determine a reasonable rate not merely with reference to the Union Pacific, but with reference to all lines serving these Colorado points by reasonably direct lines.'

"We have no doubt as to the correctness of this principle and believe it must be applied here within proper limits.

"The Cincinnati Southern Railroad is a single trunk line without branches, running from Cincinnati to Chattanooga. The main line of the Louisville & Nashville extends from Cincinnati to Louisville, and from Louisville to Nashville. Traffic from Louisville to Chattanooga passes through Nashville, and over the Nashville, Chattanooga & St. Louis to Chattanooga. For the year 1907 the gross earnings per mile of the Cincinnati Southern were, as already stated, over $26,000 per mile, those of the Louisville & Nashville about $11,000 per mile, and of the Nashville, Chattanooga & St. Louis less than $10,000 per mile. The same year the earnings of that portion of the line of the Louisville & Nashville between Cincinnati and Louisville were $25,000 per mile; between Louisville and Nashville $30,000 per mile; those of the Nashville, Chattanooga & St. Louis between Hickman and Chattanooga, a distance of 320 miles, over $20,000 per mile. Now, in adjusting the rates of the Louisville & Nashville, or the Nashville, Chattanooga & St. Louis, shall the Commission consider each section of the road by itself, or shall it establish a common rate for the whole?

"Commission rates are usually the same for all lines, both main line and branches. It is fair that the main line should in a degree contribute to the support of the branch line, for the branch-line business when it reaches the main line is surplus traffic, from which a larger profit is made. It is in the public interest that rates shall be so adjusted that population and industries may freely diffuse themselves. It hardly seems proper to fix the rates upon the Cincinnati Southern, which is really a main line, without any reference to the branch lines which contribute to it.

"This should be further borne in mind. Of the entire traffic handled by the Cincinnati, New Orleans & Texas Pacific in the year 1907 over two-thirds of the tonnage was delivered to it by its connections and most of it hauled as a through transaction from Cincinnati to Chattanooga or the reverse. Comparatively little traffic originates upon this railroad between these two termini. The present large earnings may be due to the fact that the Southern Railway is able to turn onto this road large amounts of traffic which it would exchange with some other railroad but for its interest in the Cincinnati Southern. If the city of Cincinnati were operating this property itself, it is by no means certain that the apparently undue profits of to-day might not be a deficit.

"The complainants urge that the Cincinnati Southern is really a part of the Southern Railway system. If it were so considered, the gross earnings per mile of the entire system would be less than those of either the Louisville & Nashville or the Nashville, Chattanooga & St. Louis.

"If these rates are to be established with reference to other rates in the vicinity, it becomes pertinent to inquire how the present rates compare with

other rates for similar distances in the South. Extensive tables have been furnished by the defendants instituting such comparisons, and these tables have been to some extent criticised and replied to by the complainants.

"It fairly appears that the rates now in effect from Cincinnati to Chattanooga upon the numbered classes are lower than similar rates prescribed by the Railroad Commissions of most states in the South. They are as low and usually lower than the interstate rates made by southern roads for similar distances.

"The complainants call our attention to rates from Cincinnati to Nashville. The distance is 300 miles, and the rates are materially lower than those from Cincinnati to Chattanooga, being, first class, 53 cents as against 76 cents, and, sixth class, 23 cents as against 30 cents. But this Commission has found (Chamber of Commerce of Chattanooga v. Southern Ry. Co., 10 Interst. Com. R. 111), and the federal courts have found (East Tenn., Va. & Ga. Ry. Co. v. I. C. C., 181 U. S. 1, 21 Sup. Ct. 516, 45 L. Ed. 719), that water competition influences these rates to Nashville. The rate from Cincinnati to an intermediate point where there is no water competition is higher in proportion to distance than those to Chattanooga. Thus the first-class rate from Cincinnati to Gallatin, 20 miles north of Nashville, is 78 cents.

"The complainant also refers to rates from Virginia cities to Atlanta which are less per ton mile than those in question. But it is well understood that these rates are materially affected by water competition, and ordinarily the long-distance rate would be less per ton mile than the rate for the shorter distance. If rates from Virginia cities south for distances of from 300 to 350 miles are examined, it will be found that they usually equal or exceed the Chattanooga rates.

"The complainants urge that the volume of traffic in this territory has increased and is increasing, all of which should make for lower rates—and this is certainly true; but it must also be borne in mind that the cost of operation is advancing. In the past, railways have been able to introduce various economies in the handling of their business, which have tended to offset the added cost of labor and supplies, so that the net result has been that the increase in the cost of transporting a ton of freight one mile has but slightly, if at all, increased. It is doubtful if in future similar economies can keep pace with advancing prices.

"We hesitate at this time to make widespread and far-reaching reductions in rates where there is no special occasion for it and where the rates themselves are not clearly excessive."

[3] It appears from the findings of the Commission that it has always refused in the consideration of the reasonableness of a rate or rates to consider only the particular carrier making the same by itself, but on the contrary has always considered the rates in a particular territory or the rates of other carriers to be affected by the change of the particular rate or rates in question; and we think it fair to say that, so far as the Commission is concerned, there has been a uniform policy, public policy if you please, because the Commission represents the United States in so far as it acts within the scope of its delegated authority in the establishment of reasonable and just rates, to the effect that it will not fix rates or determine their reasonableness solely upon a consideration of the particular carrier whose rates are directly involved.

[4] We think this court may take judicial knowledge of the fact that the interstate rates prescribed for the transportation of freight by common carrier must necessarily be more or less interdependent, or at least be so related to each other that the rate-making power will not, simply because it has the power, fix a rate upon a single line of rail-

roads which will necessarily disorganize established and reasonable rates on other railroads in the same territory.

[5] All rates established in accordance with law are presumed to be just and reasonable. It is for this reason that the rates for the transportation of freight of other carriers in the same territory may be looked into as evidence of what should be a just and reasonable rate, providing conditions are similar. We cannot as a court not vested with the power to fix rates say, beyond question, that the elements which the Commission took into consideration in fixing the schedule complained of were improper for the Commission to consider, and therefore cannot conclude that the Commission based a schedule of rates upon improper grounds.

It was said by the Supreme Court in Texas & Pacific Railway v. I. C. C., 162 U. S. 233, 16 Sup. Ct. 680, 40 L. Ed. 940:

"That the purpose of the act is to promote and facilitate commerce by the adoption of regulations to make charges for transportation just and reasonable, and to forbid undue and unreasonable preferences or discriminations; that, in passing upon questions arising under the act, the tribunal appointed to enforce its provisions, whether the Commission or the courts, is empowered to fully consider all the circumstances and conditions that reasonably apply to the situation, and that, in the exercise of its jurisdiction, the tribunal may and should consider the legitimate interests as well of the carrying companies as of the traders and shippers. * * *"

[6] Under the second proposition we cannot disturb the order of the Commission on the theory that it fixed rates so high as to be violative of the fifth amendment to the Constitution, unless it shall clearly appear to us that the constitutional rights of the shippers were invaded thereby. The fixing of the schedule of rates complained of was a legislative act. Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77; Peil v. Chicago N. W. Ry. Co., 94 U. S. 164, 24 L. Ed. 97; Express Cases, 117 U. S. 1, 6 Sup. Ct. 542, 628, 29 L. Ed. 791; C., M., etc., Ry. v. Minnesota, 134 U. S. 418, 10 Sup. Ct. 462, 702, 33 L. Ed. 970; Reagan v. Farmers' Loan & T. Co., 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014; St. L. & S. F. Ry. Co. v. Gill, 156 U. S. 649, 15 Sup. Ct. 484, 39 L. Ed. 567; C., N. O. & T. P. Ry. Co. v. I. C. C., 162 U. S. 184, 16 Sup. Ct. 700, 40 L. Ed. 935; T. & P. Ry. v. I. C. C., 162 U. S. 197, 16 Sup. Ct. 666, 40 L. Ed. 940; I. C. C. v. Cincinnati Ry. Co., 167 U. S. 479, 17 Sup. Ct. 896, 42 L. Ed. 243; Railroad Commission Cases, 116 U. S. 307, 6 Sup. Ct. 334, 388, 1191, 29 L. Ed. 636; Smyth v. Ames, 169 U. S. 515, 18 Sup. Ct. 418, 42 L. Ed. 819; McChord v. L. & N. R. R. Co., 183 U. S. 483, 22 Sup. Ct. 165, 46 L. Ed. 289; Alpers v. City of San Francisco (C. C.) 32 Fed. 503; So. Pac. Co. v. R. R. Commissioners (C. C.) 78 Fed. 236; New Orleans Water Works Co. v. New Orleans, 164 U. S. 471, 17 Sup. Ct. 161, 41 L. Ed. 518; Atlantic Coast Line v. North Carolina Corporation Com., 206 U. S. 1, 27 Sup. Ct. 585, 51 L. Ed. 933.

[7] And while we are of the opinion that our power to review the order of the Commission fixing a schedule of rates is coextensive with the limits of the protecting shield of the Constitution, still it must clearly appear that such protection in some degree has been taken

away. The Commission found that the rates complained of were not clearly excessive. Much less are we able to find that the rates authorized by the Commission in the order complained of and which were a reduction of the former rates are clearly excessive. In making this statement we are fully aware of the allegation of the bill as to the net earnings of the C., N. O. & T. P., and the whole case as to the excessive feature of the rates fixed by the Commission is almost entirely based upon the earnings of the C., N. O. & T. P. While earnings may be considered in the fixing of a reasonable rate to be charged by a carrier for the transportation of freight, rates necessarily cannot be based upon earnings alone. This is made clearly to appear when we consider that a just and reasonable rate is one which is just to the carrier and to the shipper. It is a rate which yields to the carrier a fair return upon the value of the property employed in the public service, and it is a rate which is fair to the shipper for the service rendered; and when this rate is established, if it results in large profits to the carrier, the carrier is fortunate in its business, and if it results in a loss of earning power so that the business of the carrier is unprofitable the carrier is unfortunate. But the rate may not be lowered or raised merely upon the ground that the carrier is either making or losing money, providing always the rate is a reasonable and just rate. Indeed, it has been held that the earning power of the rate is one of the least considerations in fixing a just and reasonable rate. Canada Northern R. R. Co. v. International Bridge Co., L. R. 8 App. Cases, 723: Board of Railroad Comm. v. I. C. R. R. Co., 20 Interst. Com. R. 181.

Being satisfied that the Commission did not err in taking into consideration the grounds they did in fixing their schedule of rates, and not being clearly satisfied that the rates themselves are so high as to violate the constitutional rights of the shippers, we are of the opinion that the bill must be dismissed.

And it is so ordered.

ARCHBALD, Judge (dissenting). There can be no serious question as to the conclusion which would have been reached by the Commission had they confined themselves to the determination of what was a just and reasonable rate from Cincinnati to Chattanooga by the Cincinnati Southern, without regard to the effect upon other roads. This was gone into at length in 1894, and the 60-cent schedule, which is now contended for, sustained. Freight Bureau v. Cin., N. O. & T. P. R. R., 6 Interst. Com. R. 195. But as the law then stood there was no authority in the Commission to fix future rates, and its action was therefore held of no effect. Inter. Com. Com. v. Cin., N. O. & T. P. R. R., 167 U. S. 479, 17 Sup. Ct. 896, 42 L. Ed. 243. But even with the lapse of time and the change of conditions, the issue as is recognized by the Commission is the same, and the same conclusion would confessedly have been reached except as they were influenced by a regard for the necessities of other roads. "If it is our duty," says Commissioner Prouty in the report, "to take this railroad

by itself, and to determine the reasonableness of these rates, by reference to cost of construction, cost of maintenance, and profit upon the investment, we think the complainants have established their case, and that these rates ought fairly to be reduced by as great an amount as was formerly found reasonable by this Commission." Unfortunately, however, for the complainants, this view did not prevail. It was contended by the railroad company that the rates should be fixed not only with reference to the final results to itself and its own financial necessities, but also with reference to other companies whose rates were necessarily affected thereby; or, in other words, that the Commission should establish rates which would be just and reasonable for the whole section of territory in issue, and that if a particular carrier was so situated that it could make a handsome profit it was to be recognized as a piece of good fortune with which the Commission was not to interfere. Adopting this view, which had also been followed in other cases (In re Proposed Advance in Freight Rates, 9 Interst. Com. R. 382; Spokane v. North Pac. R. R., 15 Interst. Com. R. 376; Kindel v. New York, New Haven & Hartford R. R., 15 Interst. Com. R. 555), it was accordingly held that the reasonableness of the rate between points served by two or more lines could not be determined by reference to that line alone which was shortest and most favorably situated with respect to operation and earnings, and the rate limited thereby; but that the entire situation was to be considered, and a rate fixed which would be reasonable with respect to all the lines directly serving the points involved. That rates for similar distances on other lines similarly conditioned may be referred to, to assist in determining what is fair and reasonable in any case, is clear. And it is no doubt proper, also, to take into account the effect on rates upon freight moving to and from other points beyond those immediately in view. But that, in my judgment, is as far as it is permissible to go. There is no right, as I look at it, to consider the effect of the rate or rates to be established on those of other roads, between the same points, or to maintain such rates at a figure which is necessary to meet the needs of those roads. And so far as the order of the Commission was induced by any such idea, it cannot be sustained.

If the Cincinnati Southern was the only line from Cincinnati to Chattanooga the rate, of course, so far as it was not a joint rate, would be fixed with reference to that road alone. And if it was a line that was costly to build, or that could not be economically run, this would operate to increase the rates, and the shipper would have to pay, to correspond. But, on the other hand, if the reverse of this was true, and the road was neither an expensive one to construct, maintain, or run, the shipper would clearly be entitled to the benefit of these conditions and to the lower rates necessarily to ensue. So, also, if this favored road was the first in the field, and other roads had come in after it was built, it certainly would not be contended that with the introduction of new and additional facilities the lower rates prevailing on the more favored line could be raised to meet the necessities of others not so well placed. It is not to be thought of that the construction of a second or third road should be made the basis for higher

rates. The standard would be that of the original and most favored line. But what difference does it make whether the road which can afford the best rate is the first or the last to be built? It is the condition at the time the rate is fixed that controls. The shipper is entitled to the benefit of any advance in transportation facilities that may be made, and is not to be tied down to the unprogressive and outdistanced past. The supposed advantage in competing lines between the same points becomes a detriment if rates are to be kept up to help the weakest road.

The Cincinnati Southern extends in a short and direct route due south from Cincinnati to Chattanooga without branches 336 miles. It was expensive to build, and the cost of operation and maintenance is high. But its net earnings are nevertheless large; amounting to some 44 per cent. on the capital stock. The route between the same points by way of the Louisville & Nashville and the Nashville, Chattanooga & St. Louis roads is a third longer, or 450 miles, and both of these roads have more or less unremunerative branch lines. And yet the Commission have not only put the two routes on an equality, but have even considered the influence of unprofitable branches, which have to be taken care of, fixing a rate which shall be fair for the whole system, and not simply for the immediate section of road which is involved. This, in my judgment, they had no right to do. The shipper is entitled to a just and reasonable rate, having regard to the service which is to be rendered by the carrier that is to perform. And this service is largely to be measured by the facilities for economically rendering it, which are possessed by that particular road. It is not to be augmented or kept up, beyond what is fair and just, by the consideration of what some other road, not so favorably situated, may need.

The order of the Commission, being based upon mistaken and erroneous grounds, is therefore invalid and should be so declared. Southern Railway v. St. Louis Hay & Grain Co., 214 U. S. 297, 29 Sup. Ct. 678, 53 L. Ed. 1004; Inter. Com. Com. v. Stickney, 215 U. S. 98, 30 Sup. Ct. 66, 54 L. Ed. 112; Southern Pacific Railway v. Inter. Com. Com., 219 U. S. 498, 31 Sup. Ct. 279, 55 L. Ed. ——. And the case should be remanded in consequence to the Commission in order that a rate may be fixed which shall be just and reasonable as respects the respondent carrier, by whom the services are to be performed. This does not take from the Commission the right to say what that rate shall be. Much less does it involve the determination of the rate by the court. It merely disposes of the rate which has been mistakenly made, as preliminary to a new consideration of it by the Commission upon correct and proper grounds. Cin., N. O. & T. P. R. R. v. Inter. Com. Com., 162 U. S. 184, 238, 239, 16 Sup. Ct. 700, 40 L. Ed. 935; Southern Railway v. St. Louis Hay & Grain Co., 214 U. S. 297, 29 Sup. Ct. 678, 53 L. Ed. 1004.

I therefore dissent from the judgment of the court sustaining the demurrer and dismissing the bill.

MACK, Judge, concurs in the above dissent.